854 So.2d 485 (2003)
Charles Kent LANGDON, Appellant,
v.
Helen Crocker LANGDON, Appellee.
Nos. 2001-CA-01077, 2001-CA-01315.
Court of Appeals of Mississippi.
September 9, 2003.
*487 Arnold F. Gwin, Greenwood, attorney for appellant.
Charles R. Brett, Tupelo, attorney for appellee.
Before SOUTHWICK, P.J., BRIDGES and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. The Chancery Court of Humphreys County granted Helen Crocker Langdon (Helen) a divorce from Charles Kent Langdon (Kent) on the ground of habitual cruel and inhuman treatment. Kent has appealed, arguing that the chancery court erred by failing to grant him a divorce on the ground of adultery, by erroneously dividing the parties' assets, and by awarding Helen attorney's fees and court reporter's fees. Prior to the divorce, Kent appealed from an order of the Chancery Court of Humphreys County finding him *488 in contempt of a temporary order. The two appeals have been consolidated.

FACTS
¶ 2. Kent and Helen were married on December 18, 1983. They had three children, all boys. At the conclusion of trial in this matter, one child was age 15 and two were age 12.
¶ 3. The parties separated on or about December 28, 1998. On March 4, 1999, Helen filed for a divorce on the ground of habitual cruel and inhuman treatment or irreconcilable differences. Kent answered and counterclaimed for a divorce on the same grounds. Helen amended her complaint to add the ground of adultery. Kent amended his counterclaim to add the ground of adultery.
¶ 4. Helen requested temporary relief. After a hearing, the chancery court awarded Helen temporary custody of the children, temporary child support, and temporary alimony. The court ordered Kent to make the monthly mortgage payments on the parties' former residence, and to retain the hospitalization and medical insurance on Helen and the children that was in force at the time of the order. The court restricted Kent from selling any asset. Subsequently, Kent failed to make the mortgage payments. The court found Kent in willful contempt and entered a judgment against him for the amount of the missed payments, $5,513.92. The court ordered his incarceration if he did not pay the amount within four days. Kent failed to pay and was incarcerated. He was released upon posting a supersedeas bond pending appeal. See M.R.A.P. 8.
¶ 5. After a three day trial, the chancery court entered an order granting Helen a divorce on the ground of habitual cruel and inhuman treatment, awarding her custody of the two youngest children, and awarding Kent custody of the oldest child. The court determined child custody and visitation, divided the parties' assets, and awarded Helen attorney's fees and court reporter's fees. Further, the court ordered Kent to pay Helen $525 per month in child support and $300 per month in alimony.

STANDARD OF REVIEW
¶ 6. This Court reviews the facts of a divorce decree in the light most favorable to the appellee. Fisher v. Fisher, 771 So.2d 364, 367 (¶8) (Miss.2000). In domestic relations matters, this Court will not reverse the findings of a chancellor unless the findings are manifestly wrong, clearly erroneous, or if the chancellor applied an incorrect legal standard. Henderson v. Henderson, 757 So.2d 285, 289-90 (¶19) (Miss.2000). We may reverse a chancellor's findings of fact only where there is no "substantial, credible evidence in the record" to justify the findings. Id.

LAW AND ANALYSIS

I. DID THE CHANCELLOR ERR IN AWARDING HELEN A DIVORCE ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT RATHER THAN AWARDING KENT A DIVORCE ON THE GROUND OF ADULTERY?
¶ 7. Kent argues that the evidence of his habitual cruel and inhuman treatment was insufficient to support the chancellor's finding that Helen was entitled to a divorce on that ground. The ground for divorce on the basis of habitual cruel and inhuman treatment must be proven by a preponderance of the credible evidence. Chamblee v. Chamblee, 637 So.2d 850, 859 (Miss.1994). "The conduct which evinces habitual cruel and inhuman treatment must be such that it (1) endangers *489 life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief, or (2) renders the marriage revolting to the non-offending spouse because it is so unnatural and infamous, and makes it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance." Mitchell v. Mitchell, 767 So.2d 1037, 1041 (¶14) (Miss. Ct.App.2000) (quoting Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993)). Generally, the conduct must be shown to have been systematic and continuous. Daigle, 626 So.2d at 144. However, a single incident may be of sufficient severity to prove the ground. Ellzey v. Ellzey, 253 So.2d 249, 250 (Miss.1971). There must be a causal connection between the treatment and the separation. Daigle, 626 So.2d at 144.
¶ 8. In her order, the chancellor recited the evidence of Kent's habitual cruel and inhuman treatment of Helen. Helen testified that Kent began abusing her six months after the parties' wedding. She stated that Kent threw a snake in the bathtub with her when she was pregnant with their youngest child. Helen testified that, in 1989, Kent beat her about the head and the resulting injuries caused her to be hospitalized for approximately one week. Three of Helen's family members testified that on that occasion they witnessed Helen's head and facial injuries, bruises on her neck and arms, and scratches, and that they knew of the hospitalization. Kent admitted that on this occasion he hit Helen with an open hand two or three times, but denied causing injury.
¶ 9. Helen testified that, during Christmas 1998, Kent hit her in the head and choked her. Helen admitted taking a handful of pain pills prior to this incident and that she "lost it" and destroyed the family's Christmas tree. Helen's sister testified that after this incident she witnessed Helen with bruises on her neck and arm and a bruised and bloody ear. Kent denied striking Helen on this occasion, and stated that Helen's head injuries occurred when she fell and hit her head on the kitchen table. It was uncontested that Helen moved out shortly after this incident.
¶ 10. Kent testified that Helen bruises easily. He further testified that, after the parties' 1998 separation, he periodically had to restrain Helen by holding her down. Helen's sister testified that she saw bruises on Helen's arm and neck in the summer of 1999. Helen testified that she sought psychiatric and psychological treatment due to Kent's abuse.
¶ 11. Our review of the record indicates that the Langdons had a tumultuous relationship. During the marriage, Kent filed for divorce one time and Helen filed twice, though the parties reconciled. Helen testified that, in December 1995, she and Kent fought and he hit her in the neck and chest areas. She presented pictures of the arm bruises and stated that the altercation incited her second filing for divorce. No other witnesses testified about that incident. Helen also testified that Kent continually insulted her appearance in front of the children and others. That testimony was corroborated by several witnesses.
¶ 12. The chancellor stated that the testimony was sufficient to prove that Helen was entitled to a divorce on the ground of habitual cruel and inhuman treatment. We find sufficient evidence in the record to support the chancellor's finding that Kent engaged in habitually cruel conduct. Helen testified about three occasions during the marriage when Kent hit her and caused injuries. These were instances of conduct endangering "life, limb or health," creating a reasonable apprehension of danger. Daigle, 626 So.2d at 144. It is *490 apparent from the testimony that the Christmas 1998 incident caused Helen's departure from the marital home. Id.
¶ 13. Kent contends that the chancellor's finding amounted to manifest error because Helen's testimony lacked sufficient corroboration. Kent admitted to having struck Helen on one of the three occasions; he only contested the severity of the injury inflicted. Other corroborating evidence was the testimony of Helen's family members that they witnessed her injuries after two of those occasions, and the photographs of the injuries from the third occasion. Because there were no eyewitnesses to any of the alleged abuse, the chancellor had to render her decision based on the parties' competing versions of events and the available corroborating evidence. See Labella v. Labella, 722 So.2d 472 (Miss.1998). The chancellor's finding was not manifest error.
¶ 14. Kent argues that the chancellor should have granted a divorce to him on the ground of adultery. At trial, Helen admitted that she had sexual relations with someone approximately sixteen months after the parties separated. The chancellor found that Helen had committed undenied, uncondoned adultery, but that Helen's adultery did not precipitate the cause of action for divorce. Helen filed for divorce on the ground of habitual cruel and inhuman treatment on March 4, 1999, and the adulterous behavior did not occur until the spring of 2000.
¶ 15. The case of Garriga v. Garriga, 770 So.2d 978 (Miss.Ct.App.2000), cited by the chancellor, parallels this case. In Garriga, the chancellor found that Mr. Garriga proved the ground of adultery and Mrs. Garriga proved the ground of habitual cruel and inhuman treatment. Id. at (¶22). The chancellor implicitly found that Mr. Garriga's habitual cruel and inhuman treatment of Mrs. Garriga made the continuation of the marital relationship impossible. Id. at (¶15). After the Garrigas separated, Mrs. Garriga committed undenied, uncondoned adultery. Id. at (¶22). The chancellor granted the divorce to Mrs. Garriga on the ground of habitual cruel and inhuman treatment. Id. at (¶14).
¶ 16. This Court affirmed the chancellor's resolution. Id. at (¶24). We stated, "[t]here can be only but one divorce granted. Where each party has requested a divorce and offers proof sufficient to establish a basis for the divorce, the chancellor must then determine which of the parties will be granted a divorce." Id. at (¶23). The Court stated that the chancellor must grant the divorce to the party whose conduct was the proximate cause of the deterioration of the marital relationship. Id. at (¶24). In the instant case, both parties proved their grounds for divorce. The chancellor found that Kent's habitual cruel and inhuman treatment was the precipitating cause of the deterioration of the Langdon's marital relationship. The testimony indicated that Helen's adultery occurred at least one year after she filed for divorce. The chancellor's refusal to grant the divorce to Kent was not manifest error.
¶ 17. Kent also argues that, because Helen resumed marital relations and cohabitation with him after the 1989 and 1995 incidents, Helen condoned any cruel and inhuman treatment that may have occurred during those incidents. Kent argues that, because Helen condoned Kent's conduct during the 1989 and 1995 incidents, those incidents cannot be considered as evidence of Kent's habitual cruel and inhuman treatment of Helen.
¶ 18. Cruel and inhuman treatment is an offense of a continuing nature. Chaffin v. Chaffin, 437 So.2d 384, 386 (Miss.1983). It is not condoned by continuance of cohabitation, but may be condoned *491 where the parties separated and then resumed the marital relationship. Id. However, where condonation has occurred, if the cruel conduct subsequently occurs, the previous offenses are revived for the chancellor's consideration of the ground of habitual cruel and inhuman treatment. Id. Therefore, even if Helen condoned the 1989 and 1995 incidents by resuming marital relations with Kent, the chancellor properly considered those incidents as evidence of habitual cruel and inhuman treatment because Kent engaged in physically violent conduct toward Helen in 1998. This argument is without merit.

II. DID THE CHANCELLOR ERR IN THE DIVISION AND DISTRIBUTION OF THE PARTIES' ASSETS?
¶ 19. Kent argues that the chancellor committed several reversible errors in her distribution of the parties' assets. He requests that this Court remand to allow the chancellor to make a correct division in light of his assertion that the condition of the assets has changed since the chancellor's order.
¶ 20. Division of marital assets is conducted according to Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994). Initially, the chancellor must characterize each asset as marital or non-marital according to Hemsley. Id. Then, the chancellor must equitably divide the marital property using the guidelines articulated in Ferguson, considering each party's non-marital assets. Id. These guidelines are: "(1) substantial contributions to the accumulation of the property, including economic and domestic contributions by each party to the marriage, (2) expenditures and disposal of the marital assets by each party, (3) the market value and emotional value of the marital assets, (4) the value of the nonmarital property, (5) tax, economic, contractual, and legal consequences of the distribution, (6) elimination of alimony and other future frictional contact between the parties, (7) the income and earning capacity of each party, and (8) any other relevant factor that should be considered in making an equitable distribution." Selman v. Selman, 722 So.2d 547, 552 (¶16) (Miss.1998). If, after equitable division, the marital property, considered with each party's non-marital assets, will not adequately provide for one party, then the chancellor should consider alimony. Johnson, 650 So.2d at 1287.

A. Helen's personal injury settlement
¶ 21. In 1997, Helen was involved in an automobile accident. She sustained back and shoulder injuries, and developed hydroencephalus, for which she has a surgically implanted shunt transferring fluid from her brain to her stomach. Helen instigated a lawsuit against the other driver and his insurer. Kent did not assert a loss of consortium claim and was not otherwise a party to the suit. The case settled. Kent argues that the chancellor erred in finding that the settlement funds were non-marital.
¶ 22. The record reflects that there were two amounts received in settlement of Helen's claim, one for $25,000, and, later, one for $200,000. Of the $25,000 amount, Helen's attorney retained a portion for his fees, and used a portion to pay some of Helen's medical bills, leaving a remainder of $2,723.27. Of the $200,000, Helen's attorney retained one-third for his fees and added the $2,723.27 remainder, resulting in proceeds of $136,056.60. From this amount, the attorney subtracted deposition costs and $40,000, which was held in a certificate of deposit in the names of Helen and the attorney for payment of *492 any subrogation claims that might arise within three years of the settlement. After the parties separated, the remaining $96,030.45 was disbursed in a check made out to both Helen and Kent. Kent endorsed the check and gave it to Helen. Helen bought a $40,000 certificate of deposit and used it as collateral to purchase a residence. She used the remaining settlement funds to purchase household items and to pay living expenses for herself and the three boys.
¶ 23. In Tramel v. Tramel, 740 So.2d 286, 290 (¶16) (Miss.1999), the supreme court held that the chancellor must use an analytic approach to classify proceeds of a personal injury suit as marital or personal. The analytic approach requires the chancellor to focus on the type of loss the settlement was intended to compensate. Id. at (¶12). "That portion of the proceeds allocable to compensation to the initially injured spouse for pain, suffering and disfigurement" is that spouse's separate property and, thus, "should be awarded in its entirety to the injured spouse." Id. at (¶18). "That portion allocable to lost wages, lost earnings capacity and medical and hospital expenses, to the extent those apply to the time period of the marriage, are marital assets and are to be divided according to equitable distribution principles." Id. That portion allocable to loss of consortium is the separate property of the spouse who suffered that loss, and is to be awarded in its entirety to that spouse. Id. The Tramel court recognized that the personal injury settlement may not provide much guidance to the chancellor, and charged the chancellor with performing "the alchemy of turning gross sums into clear, detailed portions. To that end, he is entitled to see such evidence and argument as is necessary to make the most informed assessment." Id.
¶ 24. In the instant case, the chancellor conducted the analysis required by Tramel. The chancellor found that there was no evidence as to those portions of the proceeds allocable to lost wages, lost earnings capacity, and medical and hospital expenses to the extent they applied during the marriage. The chancellor found no evidence of loss of consortium. The chancellor stated that, based upon the testimony and the evidence, the entire $200,000 settlement was compensation for Helen's injuries, pain, suffering and disfigurement, and was Helen's separate property.
¶ 25. Kent argues that the chancellor erred by finding that the entirety of the proceeds of the settlement was non-marital. Kent's argument is that, because there was evidence that Helen lost earnings capacity, incurred medical bills during the marriage, and that Kent suffered loss of consortium, the chancellor was bound to find that part of the personal injury settlement was intended to compensate those losses. Kent cites the evidence of those losses. The evidence that Helen lost earning capacity was her testimony that she tended to the parties' car wash business prior to the accident and that the accident left her unable to continue that job. The evidence of medical expenses was Helen's testimony that she incurred over $72,000 in medical bills, and that $40,000 was being held by her attorney for potential subrogation claims. The evidence that Kent suffered loss of consortium was his trial testimony that he still has a loss of consortium claim.
¶ 26. We find that there was substantial evidence supporting the chancellor's determination. The chancellor found the evidence insufficient to conclude that any portion of the settlement was intended to compensate for Helens' lost earnings capacity, her medical expenses during the *493 marriage, or Kent's loss of consortium. The chancellor found sufficient evidence to conclude the settlement was intended to compensate Helen for injuries specific to her under Tramel. We find that this was a reasonable conclusion in light of the evidence. There was abundant evidence that Helen incurred severe pain, suffering and disfigurement, which supports the chancellor's conclusion that the $200,000 was intended to compensate her for those injuries. Kent presented no evidence of the value of Helen's contributions to the marriage from her work at the car wash. Tramel contemplates that settlement proceeds are marital property if allocable to reimburse the parties for medical bills incurred during the marriage. Id. at (¶ ¶ 17-18). It may be presumed from the record that the $72,000 in medical bills were paid by the initial $25,000 settlement amount and by Helen's insurance carrier. Thus, even if portions of the proceeds had been allocable to medical bills, there was no proof that any marital funds were used to pay those bills that would necessitate reimbursement. Kent refused to assert a loss of consortium claim in the lawsuit, so it was not error for the chancellor to conclude that none of the settlement compensated that loss.

B. Net proceeds from sale of vacant lot
¶ 27. Helen testified that, in 1997, she purchased a vacant 4.1 acre lot for $33,000. Helen's father deeded his house to Helen for use as collateral for a mortgage on the lot. The lot was titled solely to Helen. In September 2000, Helen sold the vacant lot for $50,000. After payoff of the mortgage and attorney's fees, her net receipt was $10,281.64. Of that amount, Helen used $5,240.41 to pay off another loan incurred during the marriage. Helen used the remaining $5,041.23 for living expenses for herself and the children after the separation. After the sale, Helen deeded her father's house back to him.
¶ 28. The chancellor found that the net proceeds from the sale of the lot were Helen's non-marital asset and that the proceeds had been depleted. Kent contends that the chancellor's findings were error. He argues that the proceeds were marital property because the vacant lot had been acquired during the marriage.
¶ 29. Assets acquired during the marriage are presumptively marital assets subject to equitable distribution. Hemsley, 639 So.2d at 914. In this instance, the vacant lot was acquired during the marriage, giving rise to the presumption that it was a marital asset. However, an asset may be classified as non-marital if it is purchased with one spouse's separate funds, such as gifts or inheritances. Ferguson, 639 So.2d at 929. Here, the evidence reflects that Helen's father gave Helen the house for the sole purpose of facilitating her purchase of the lot. The use of the house was a gift to Helen that Helen used to procure the mortgage on the lot. There was no evidence that Helen made a down payment on the lot that could have come from marital funds, and no evidence of commingling. There was no evidence that Kent expended efforts that resulted in the lot's appreciation in value. Carrow v. Carrow, 642 So.2d 901, 906 (Miss.1994). We find that there was substantial evidence to support the chancellor's finding that the net proceeds from the sale of the lot were Helen's separate asset. Moreover, the chancellor found that the asset had been depleted by its use to pay off a marital debt and to support Helen and the children. This issue is without merit.

C. Personal property and net proceeds from sale of residence
¶ 30. The chancellor used the Ferguson guidelines to divide the parties' *494 marital property. The chancellor gave Kent personal property valued at $30,150 and gave Helen personal property valued at $10,350. The chancellor ordered the sale of the parties' former residence. The parties agreed that the value of the residence was $150,000, and the chancellor found that the equity in the residence was $88,650. The chancellor divided the equity equally between the parties. The chancellor noted that an airplane used by Kent in his former crop dusting business had been repossessed and sold, leaving a deficiency balance of $25,591.88. The chancellor found that Kent should pay this balance out of his portion of the equity.
¶ 31. Kent argues that the chancellor erred by subtracting the airplane debt from his portion of the equity because it resulted in his receipt of $5,792 less than Helen. While the chancellor made no specific findings as to the airplane debt, she considered the Ferguson factors in her division of the marital assets, and found that Kent should be responsible for the majority of the debt. "With respect to issues of fact where chancellor made no specific finding, this Court proceeds on the assumption that chancellor resolved all such fact issues in favor of the appellee, or at least in a manner consistent with the decree." Smith v. Smith, 545 So.2d 725, 727 (Miss.1989). Ferguson does not require that the chancellor divide assets equally, only equitably. Love v. Love, 687 So.2d 1229, 1232 (Miss.1997). The chancellor noted that Helen had a significantly lower income and earning capacity than Kent. The record reflects that Kent was primarily responsible for the purchase, maintenance and disposal of the airplanes used in his crop dusting service. This issue is without merit.

D. Property taxes
¶ 32. The chancellor ordered Kent to pay delinquent property taxes on the parties' former residence in the amount of $7,823.29. This amount reflects unpaid taxes from 1998, 1999, and 2000. Kent argues that the chancellor unfairly placed the tax burden upon him.
¶ 33. We find that the chancellor's decision was not manifest error. The chancellor used the Ferguson guidelines to divide the marital property. The chancellor ordered Helen to pay the 2001 taxes and taxes for all years subsequent to the divorce until the sale of the residence. The chancellor noted that Helen earned $800 to $1,000 per month, while Kent earned $3,902.25 per month, and was eligible for a $15,000 yearly bonus. In light of Helen's considerably lower income, it was permissible for the chancellor to order Kent to pay the delinquent taxes, which constituted a lump sum, while giving Helen the prospective tax burden.

E. Helen's medical bills
¶ 34. This issue is one of contempt of the temporary order that is the subject of the consolidated appeal. The temporary order required Kent to continue providing the health insurance coverage already in force for Helen and the children pending the parties' divorce. We presume from the record that Kent complied until April 2000, when he ceased to pay the premiums for Helen's coverage. Helen's coverage was therefore canceled. Kent purchased new health insurance for himself and the children. Helen testified that Kent never informed her that her coverage had been canceled. On November 14, 2000, Helen filed a motion for citation of contempt for Kent's failure to retain her medical coverage, inter alia. She alleged that she incurred $2,863 in medical bills during the time she was uninsured.
¶ 35. Kent testified that he mailed the insurance premium in April 2000, and that *495 the insurance company returned his check and mailed him a letter stating that it was discontinuing medical coverage in Mississippi as of November 1, 2000. The chancellor found that the temporary order required Kent to retain health insurance on Helen and that Kent failed to do so. The court ordered Kent to pay Helen the $2,863 in medical bills "in view of [Helen's] medical condition and all other factors of this case."
¶ 36. We view the chancellor's decision as a finding of civil contempt and an imposition of monetary sanctions for damages sustained thereby. Illinois Cent. R.R. Co. v. Winters, 815 So.2d 1168, 1180 (¶47) (Miss.2002). This Court will not reverse a finding of civil contempt unless the lower court committed manifest error. Id. at (¶45).
¶ 37. On appeal, Kent argues that the chancellor erred in holding him in contempt because it was impossible for him to comply with the temporary order. He asserts that he could not continue Helen's coverage because the insurance company returned his premium. He cites the insurance company's letter as evidence that it was canceling the policy and would not accept premiums. We review the evidence of Kent's inability to comply with the order. Kent mailed the premium check, which was dated April 1, 2000, to the insurance company. The check was returned to Kent in its original envelope, which bears a stamp stating "return to sender" and "no such number." The insurance company's letter, dated April 28, 2000, states that the coverage would terminate in November "provided coverage is otherwise in-force [sic] and premiums for coverage have been paid when due." There was substantial evidence for the chancellor to conclude that the insurance company never refused any premiums to secure Helen's coverage from April until the November cancellation date. The chancellor did not commit manifest error by finding Kent in contempt.
¶ 38. Kent also argues that the chancellor's decision was unsupported by the evidence because Helen submitted insufficient proof of the medical bills. The record shows that Helen testified that she incurred over $2,863 in medical bills during the applicable time period. She testified to particular bills for $500, $200 and $1700. Kent never contested Helen's assertion that she incurred the bills. The chancellor chose to credit Helen's testimony as to the amount of the bills. See McLemore v. McLemore, 762 So.2d 316, 321 (¶17) (Miss. 2000). The chancellor's decision was not manifest error.

F. Attorney's fees and court reporter's costs
¶ 39. Helen requested attorneys' fees and costs. The chancellor found that Helen lacked the ability to pay these expenses. The chancellor ordered Kent to pay $3,000 in attorneys' fees and $383.70 in court reporting fees. Kent argues the chancellor's award was error because Helen had an "obvious ability" to pay her attorneys.
¶ 40. "The general rule is that if a party is financially able to pay his attorney fees he should do so, though this is a matter which is entrusted to chancellor's sound discretion." Labella v. Labella, 722 So.2d 472, 475 (¶13) (Miss.1998). In assessing the appropriateness of an award, the chancellor should consider the relative financial ability of the parties. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982). "[W]here the record shows an inability to pay and a disparity in relative financial positions of the parties, there is no error in awarding attorney's fees." Bates v. Bates, 755 So.2d 478, 482 (¶11) (Miss.Ct.App. *496 1999). Additionally, the chancellor should consider "the skill and standing of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case." McKee, 418 So.2d at 767.
¶ 41. In the case sub judice, the chancellor examined the hourly rates of Helen's three trial attorneys and found they were reasonable. The chancellor stated that, considering Helen's income, non-marital assets, monthly expenses and the awards made in this case, that she does not have the ability to pay her attorney to pay the court reporting fees. The court noted that Helen has had physical problems since the accident and has limited education and work experience. Our review of the record indicates that Helen met her burden of proof to show that she was unable to pay the attorneys' fees and costs. As previously noted, there was a significant disparity in the parties' incomes and earnings capacity. The chancellor's award was within her sound discretion.
III. DID THE CHANCELLOR ERR IN ORDERING CHARLES TO PAY AN EXCESSIVE AMOUNT OF TEMPORARY SUPPORT AND IN FINDING HIM IN CONTEMPT OF COURT AND ORDERING HIS INCARCERATION FOR FAILURE TO PAY?
¶ 42. After a hearing, the chancellor held Kent in civil contempt for his failure to pay the mortgage as required by the temporary order. The chancellor allowed Kent several days to make the payments or be incarcerated. Kent failed to pay.
¶ 43. Whether a party is in civil contempt is within the chancellor's substantial discretion. Varner v. Varner, 666 So.2d 493, 496 (Miss.1995). The chancellor's finding will be upheld absent manifest error. Illinois Cent. R.R. Co., at (¶45). At the hearing, Kent asserted that he was unable to make the mortgage payments. "A defendant may avoid a judgment of contempt by establishing that he is without the present ability to discharge his obligations. However, if the contemnor raises inability to pay as a defense, the burden is on him to show this with particularity, not just in general terms." Varner, 666 So.2d at 496.
¶ 44. Kent failed to file for modification of the temporary order prior to being held in contempt of the order. At the hearing, Helen testified that Kent made $50,000 per year with a yearly bonus of $20,000. Kent alleged that his sole income was $3011 per month as a farm manager. He stated that housing was provided as part of his farm managing job, but that he was responsible for utilities. He asserted that his monthly expenses were $1500 in temporary child support and alimony and $294 in medical insurance. He alleged that, with these expenses, making the mortgage payments of $1100 per month would leave him with only $117 per month for living expenses. He stated that he had been discharged from a crop dusting job because his employer feared liability. Kent did not offer any documentary evidence of his income and expenses. The chancellor was within her discretion in finding that Kent had not demonstrated his inability to make the monthly mortgage payments and in holding him in contempt.
¶ 45. THE JUDGMENTS OF THE CHANCERY COURT OF HUMPHREYS COUNTY ARE AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF *497 THESE APPEALS ARE ASSESSED TO CHARLES KENT LANGDON.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND GRIFFIS, JJ., CONCUR.