ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. On March 31, 2008, after a turbulent four-year marriage, the George County Chancery Court granted Tena Goellner a divorce from Jeffery Goellner on the ground of habitual cruel and inhuman treatment. The court awarded Tena temporary alimony and made an equitable distribution of the couple’s marital property. Aggrieved by the chancellor’s ruling, Jeffery appeals and raises four issues. Finding no error, we affirm.
 

 FACTS
 

 ¶ 2. While both were still married to other people, Tena and Jeffery began living together in September 2002. After obtaining divorces from their respective spouses, Tena and Jeffery married each other on March 8, 2003. No children were born to the marriage. At the time Tena and Jeffery married, Tena worked for the Jackson County Sheriffs Department, but prior to her employment with the sheriffs department, she had worked as a hairdresser since 1986. Due to Tena’s relocation outside of Jackson County after her marriage, she lost her job with the sheriffs department, so she resumed her career as a hairdresser. At the time of the divorce, Tena was working at Ellen’s Cut and Style in Moss Point, Mississippi, and she attended college pursing a degree in drafting and design. Jeffery had been employed at Chevron, in Pascagoula, Mississippi since July 1999.
 

 ¶ 3. Tena and Jeffery agree that there were some good times during the marriage, but they both stated that there were numerous arguments and periods of separation.
 
 [1]
 
 Although they disagree about how many times Tena left the marital home, both parties agree that on at least four occasions Tena removed some of her belongings and left for a matter of days or weeks. Tena claims she left because of physical abuse.
 

 ¶ 4. Law enforcement was summoned to the couple’s home, in Lucedale, Mississippi on at least two occasions. On December 26, 2005, the couple had an altercation, and Tena called the police alleging physical abuse. Jeffery was arrested, and a court date was set on a domestic violence charge, but the case never went to trial. Jeffery claims it never went to trial because Tena would not cooperate with the prosecutor, but Tena contradicts his account of the facts. She asserts that they had a court date; the court date was postponed; she did not hear anything else about the case; and she did not know why the case had not gone forward. The parties have placed nothing in the record either to substantiate stories or to verify why the case against Jeffery for domestic violence had not been pursued.
 

 ¶ 5. Throughout the marriage, Tena suffered from depression, and she had overdosed on medications twice. Tena admitted that one overdose was an attempted suicide, but she was adamant in her testi
 
 *1254
 
 mony that the other overdose was accidental. In addition to her claims of physical abuse, Tena alleges that Jeffery repeatedly called her vulgar names, denigrating and verbally abusing her. Jeffery denies the allegations of physical abuse and claims that Tena had a history of drug abuse. To rebut Tena’s accusations, Jeffery’s first wife and his sister both testified at trial that Jeffery was not a violent person. Nevertheless, based on the evidence, the chancellor determined that Tena was entitled to a divorce on the ground of habitual cruel and inhuman treatment, and he ordered distribution of the couple’s property. Despite their rocky relationship, Tena and Jeffery had attained significant assets during them marriage.
 

 ¶ 6. The couple jointly owned properties in George County, which appraised for $135,000 as of January 8, 2008. Jeffery and Tena acquired this property in two separate transactions. In July 2003, they purchased a twenty-acre parcel of land for $33,600, and in December 2003, they purchased a fifteen-acre parcel of land for $24,500. Tena paid the down payments on both land purchases- — one totaling $9,990 and the other totaling approximately $7,000. She also paid $2,400 for the digging of a well, and $3,000 for a septic system and use of a tractor. The couple purchased a mobile home in which to live, and Tena initially paid the full purchase price of $13,000. However, Jeffery later reimbursed $10,000 of the purchase price to Tena. Tena made some of the payments on the mobile home until she lost her job at the sheriffs department. Jeffery made a lump-sum payment of $57,000 on the property and mobile home. Additionally, in order to eliminate the mortgage, Jeffery took out a $30,000 loan against his retirement account for the remainder owed on the property, and at the time of the divorce hearing, he still owed $17,000 on that loan.
 

 ¶ 7. The parties also paid for each other’s vehicles. Tena paid $23,941 toward a 2002 GMC truck, which Jeffery had purchased prior to the couple’s marriage, and Jeffery bought Tena a 2000 Honda Accord for $11,942.50. After the parties separated, Tena gave a Honda automobile to her daughter because her daughter had recently divorced and needed transportation, and Tena replaced the Honda with a used 2004 Mazda RX-8. At the time of the divorce, Tena had a car note of $279 per month for the Mazda.
 
 [2]
 
 Jeffery and Tena also purchased motorcycles while they were married, with each party paying for his or her own. At the time of the divorce, Tena was continuing to make payments of $142 per month on her motorcycle. Tena’s financial contribution to the aforementioned purchases was possible because of the sale of a home that she owned prior to her marriage to Jeffery. She received $68,000 from the sale of that home.
 

 PROCEDURAL HISTORY AND PROPERTY DIVISION
 

 ¶ 8. Tena filed a complaint for divorce on May 23, 2007. Claiming that she was in fear for her own safety, Tena also requested ex parte relief seeking temporary alimony, a temporary restraining order, and an order to enjoin Jeffery from disposing of assets. In response, Jeffery filed his answer to the complaint, along with affirmative defenses, a counterclaim, and a motion for temporary relief. Jeffery denied the allegations set forth in Tena’s corn-
 
 *1255
 
 plaint and counterclaimed for divorce on the grounds of habitual and excessive use of opium, morphine, or other like drug; habitual cruel and inhuman treatment; or, in the alternative, irreconcilable differences. Additionally, Jeffery requested that Tena be enjoined and restrained from harassing, abusing, threatening, or intimidating him; and he requested that she be permanently enjoined and restrained from coming onto his into his property and residence.
 

 ¶ 9. A temporary order was issued by the court on August 1, 2007, in which the court granted Tena $800 in temporary alimony for the months of August and September 2007. The court also ordered an appraisal of the jointly owned real property, and the parties were enjoined from harassing or interfering with the other or disposing of or encumbering any marital asset. The divorce hearing was conducted on January 17, 2008. At the conclusion of the trial, the court allowed each party to submit briefs on the property-division issue. After all the property, both real and personal, was designated as marital or non-marital and a valuation was done, the chancellor made an equitable distribution of both the marital assets and liabilities. Tena received net marital equity of $127,281.27, and Jeffery received net marital equity of $168,031.27.
 

 ¶ 10. After considering the appraisals of the property, the court found the value of the land and improvements to be $135,000, with an outstanding loan balance of $23,391.49, as of March 31, 2007, which was secured by Jeffery’s retirement account. Therefore, the court found the net equity in the marital domicile and real property to be $111,608.51. The court awarded the marital domicile and real property to Jeffery and directed him to pay Tena $55,804.26 within ninety days of the judgment. Tena then was to quitclaim any and all interest that she had in the property to Jeffery.
 

 ¶ 11. Jeffery was awarded the 2005 GMC truck, valued at $25,000, and Tena was awarded the 2004 Mazda. The Mazda was found to have no marital equity, and Tena was directed to pay the $14,000 balance on its loan. Each party was awarded their respective motorcycle, and Tena was to pay the $4,200 still owed on her motorcycle. The court awarded Tena the personal property listed on her financial declaration, which was valued at $1,000, and Jeffery was awarded the household furnishings listed on his financial declaration, which were valued at $2,000. Additionally, each party was awarded a television, which were valued at $500 each; Tena was awarded a computer valued at $600; and Jeffery was awarded a lawnmower and guns valued at $1,500 collectively. Both Jeffery and Tena were ordered to pay their own attorneys’ fees.
 

 ¶ 12. Jeffery and Tena have individual retirement accounts that were in place before and during their marriage, as well as other bank accounts. Basically, the chancellor made an equal division of the marital asset portion of those bank and retirement accounts. As Jeffery’s accounts had considerable funds and require detailed explanation, they will be discussed in greater detail later in the opinion.
 

 ¶ 13. Tena was granted a divorce from Jeffery on March 31, 2008, on the ground of habitual cruel and inhuman treatment accompanied with the property division set out above.
 

 I. WHETHER THE CHANCELLOR WAS MANIFESTLY WRONG IN GRANTING TENA A DIVORCE ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT.
 

 ¶ 14. “The chancery court sitting as the trier of fact has the primary author
 
 *1256
 
 ity and responsibility to assess the credibility of witnesses.”
 
 Sproles v. Sproles,
 
 782 So.2d 742, 746(¶ 12) (Miss.2001) (citation omitted). “[W]here we find substantial evidence in the record supporting the findings of fact, we will seldom reverse, whether those findings be of ultimate fact or evidentiary fact.”
 
 Id.
 
 (citation omitted).
 

 ¶ 15. In
 
 Langdon v. Langdon,
 
 854 So.2d 485, 488-89(¶ 7) (Miss.Ct.App.2003), this Court stated:
 

 The ground for divorce on the basis of habitual cruel and inhuman treatment must be proven by a preponderance of the credible evidence. The conduct which evinces habitual cruel and inhuman treatment must be such that it (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief, or (2) renders the marriage revolting to the non-offending spouse because it is so unnatural and infamous, and makes it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance. Generally, the conduct must be shown to have been systematic and continuous. However, a single incident may be of sufficient severity to prove the ground. There must be a causal connection between the treatment and the separation.
 

 (Internal citations and quotations omitted).
 

 ¶ 16. Although we do not set forth an exhaustive list of Tena’s and Jeffery’s accusations, the following is an adequate rendition of the couple’s history. Tena recounted several occasions of physical assault during the marriage, and law enforcement was called to Jeffery and Tena’s premises on at least two occasions, with Tena alleging abuse by Jeffery. She testified that once, while sitting in a chair, Jeffery slung her and the chair against a counter, injuring her leg. She also testified that during one of the altercations she suffered a black eye
 
 [3]
 
 and an injured wrist, for which she sought medical treatment. Jeffery denied hitting Tena, and he claimed that Tena’s medical records fail to substantiate or support her allegations of abuse because the records merely state that she was treated for pain in her arm without any notation of a black eye or statement that it was the result of domestic abuse. However, this is somewhat contradicted in Jeffery’s brief to this Court. In his brief, he admits that, following the altercation after which he was arrested, the police documented a “slight injury” to Tena’s arm, as well as a “red swollen area” on Jeffery’s face. It seems apparent to us that there was a physical altercation between the couple.
 

 ¶ 17. Tena also presented testimony from her daughters to support her allegations of abuse. Although neither daughter testified that they had ever seen Jeffery hit Tena, they did state that they had witnessed Jeffery repeatedly yelling at Tena and calling her vulgar names. One of her daughters testified that she saw a red mark on Tena’s face after the incident that led to Jeffery’s arrest, and that, in the past, she had seen Jeffery shove Tena. Jeffery acknowledges that the marriage was turbulent and that the parties argued, but he blamed Tena’s erratic and irrational behavior as being the catalyst for the altercations. Jeffery argues that throughout the marriage Tena exhibited a history of drug abuse and depression. Indeed, she was treated on two separate occasions for a drug overdose, and on another occasion, he found her outside with a gun threatening to kill herself. According to
 
 *1257
 
 Jeffery, the gun incident occurred after they had a “small argument.” Undoubtedly, the couple had a very troubled relationship, and Tena was an emotionally disturbed and distraught individual.
 

 ¶ 18. In his brief to this Court, Jeffery appears to minimize Tena’s claims of abuse by stating that she alleged
 
 only
 
 three instances of physical abuse over the four-year marriage, and that he was arrested
 
 only
 
 once for abuse. He contends that this cannot be considered a “continuing course of conduct.” Jeffery further argues that the instances of violence were very minor and that there was no serious danger, or reasonable apprehension of danger, to Tena’s life or health. Furthermore, Jeffery maintains that Tena was an active participant in these arguments and “was not victimized in the least.”
 

 ¶ 19. There is no way for this Court to know the extent to which Tena may have been an “active participant” during these “altercations,” but we disagree with Jeffery’s purported belief that Tena could not have been victimized. We recognize that the emotions of fear and apprehension are subjective, and we take note of Jeffery’s testimony that he is six foot three and weighs about 320 pounds. It is plausible that during these physical altercations, Tena was in reasonable apprehension of danger to her life, limb, or health.
 

 ¶ 20. Furthermore, the supreme court has held that:
 

 Habitual cruel and inhuman treatment may consist of repeated acts of the same nature such as personal violence, or it may consist of a series of acts, some of the same nature and some of different natures, but which, when taken together, tend to cause pain and suffering on the part of the innocent spouse.
 

 Savell v. Savell,
 
 240 So.2d 628, 629-30 (Miss.1970) (citation omitted). And that “[tjhere are many kinds of acts such as ... verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.”
 
 Id.
 
 This Court recognized in
 
 Langdon
 
 that even a single incident may be of sufficient severity to prove the ground of habitual cruel and inhuman treatment.
 
 Langdon,
 
 854 So.2d at 489(117).
 

 ¶ 21. The chancellor was faced with stories from the parties that differed in some respects by 180 degrees. Although the chancellor stated that both parties contributed to the failure of the marriage, he found that Jeffery’s outbursts of anger, abusive language, and the physical altercations supported Tena’s plea for a divorce based on the ground of habitual cruel and inhuman treatment. The supreme court “has repeatedly stated that it will examine the record and accept the evidence reasonably tending to support the findings made below, along with all reasonable inferences which may be drawn therefrom and which favor the trial court’s finding of fact.”
 
 Sproles,
 
 782 So.2d at 746(¶ 12). “Put another way, unless the chancellor’s determination of fact in a divorce case is manifestly wrong, this Court will uphold the chancellor’s decision.”
 
 Id.
 
 (citation omitted). The record is replete with facts sufficient to support a determination that the couple had a very tumultuous relationship. We find that the chancellor did not abuse his discretion when he found Tena’s testimony credible and granted her a divorce on the ground of habitual cruel and inhuman treatment, nor did he commit manifest error. Therefore, we will not disturb his decision. This issue is without merit.
 

 II. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN AWARDING PERIODIC ALIMONY TO TENA.
 

 ¶ 22. It is well settled that the following factors are to be considered by
 
 *1258
 
 the chancellor when determining if an award of alimony is justified. They are:
 

 1. The income and expenses of the parties;
 

 2. The health and earning capacities of the parties;
 

 3. The needs of each party;
 

 4. The obligations and assets of each party;
 

 5. The length of the marriage;
 

 6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
 

 7. The age of the parties;
 

 8. The standard of living of the parties, both during the marriage and at the time of the support determination;
 

 9. The tax consequences of the spousal support order;
 

 10. Fault or misconduct;
 

 11. Wasteful dissipation of assets by either party; or
 

 12. Any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.
 

 Armstrong v. Armstrong,
 
 618 So.2d 1278, 1280 (Miss.1993).
 

 ¶ 23. Jeffery argues that the chancellor’s findings of fact do not meet the standard demanded by the supreme court in Armstrong. He argues that the chancellor failed to address the needs of the parties, the standard of living of the parties, any wasteful dissipation, and other factors. He asserts that the chancellor did not make any effort to explain the award or adequately address all of the
 
 Armstrong
 
 factors or make sufficient findings of fact and conclusions of law regarding the
 
 Armstrong
 
 factors. Additionally, Jeffery contends that Tena’s financial statement reveals extravagant expenses, and that the chancellor erred when he failed to question these expenses or Tena’s stated earning potential. We disagree.
 

 ¶ 24. This Court has stated:
 

 When the chancellor fails to address all factors on-the-record, we are not required to remand the case, and should not, so long as all facts are available to us so as to allow an equitable determination to be made. Thus, a lack of an on-the-record consideration of the
 
 Armstrong
 
 factors by a chancellor in making his determination of the appropriateness of an alimony award will only be reversed if, after a review of all facts and application of the
 
 Armstrong
 
 factors, it appears that the chancellor’s failure to make findings of fact and corresponding conclusions of law constitutes manifest error.
 

 Dorsey v. Dorsey,
 
 972 So.2d 48, 54 (¶ 17) (Miss.Ct.App.2008) (internal citation omitted). In other words, “[ejven if the chancellor has failed to delineate all the factors on the record, where all the facts are available to us, we are not required to remand the case to the trial court.”
 
 Voda v. Voda,
 
 731 So.2d 1152, 1155 (¶ 11) (Miss.1999). We find that, although the chancellor may not have expounded on every
 
 Armstrong
 
 factor, he gave ample consideration to them when arriving at his decision.
 

 ¶ 25. To begin with, the chancellor acknowledged the statutory authority to award alimony in a divorce, which is found in Mississippi Code Annotated section 93-5-23 (Rev.2004). It states:
 

 When a divorce shall be decreed from the bonds of matrimony,
 
 the court may, in its discretion,
 
 having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just,
 
 make all orders touching the ... maintenance and alimony of the wife or the husband,
 
 or any allowance to be made to her or him, and shall, if need
 
 *1259
 
 be, require bond, sureties or other guarantee for the payment of the sum so allowed.
 

 Miss.Code Ann. § 93-5-23 (emphasis added). The chancellor then acknowledged that an award of alimony was largely within the discretion of the trial court, and that the court had at its disposal several ways in which it could require alimony payments to best serve the parties’ needs under the guidance of
 
 Hubbard v. Hubbard,
 
 656 So.2d 124, 129 (Miss.1995).
 
 [4]
 
 Thereafter, the chancellor quoted the
 
 Armstrong
 
 factors, then stated the following:
 

 The Court finds this to be a short-term marriage that does not warrant the award of long-term alimony benefits. After reviewing the income and expenses of the parties, there is a disparity of income between these parties and the Court finds that, although Ms. Goellner is awarded a divorce based on habitual cruel and inhuman treatment, both parties contributed to the failure of this marriage. Ms. Goellner will complete her education in May of 2009 and she will receive a drafting and design degree. There are no minor children born to this marriage and both parties appear to be healthy other than Ms. Goellner’s battle with depression and her ulcers. Ms. Goellner is 46 years old and currently working as a cosmetologist. Mr. Goellner is 40 years old and currently working as an operator at Chevron.
 

 ¶ 26. It seems clear to us that the chancellor considered no less than six of the
 
 Armstrong
 
 factors. He addressed the length of the marriage, the fault of the parties, the lack of children, the health of the parties, the age of the parties, and the income and expenses of the parties. However, in accordance with the
 
 Dorsey
 
 court, we will “review all the facts and appl[y] ... the
 
 Armstrong
 
 factors .... [to determine if] it appears ... the chancellor[ ] fail[ed] to make findings of fact and corresponding conclusions of law [and whether his finding] constitutes manifest error.”
 
 Dorsey,
 
 972 So.2d at 54(¶ 17).
 

 1. The Income and Expenses of the Parties
 

 ¶ 27. The record supports the chancellor’s recognition of the disparity in income between Tena and Jeffery, as well as Tena’s health and her expenses. Tena’s and Jeffery’s tax returns for 2005 through 2007 verify the vast difference between the parties’ incomes. In 2005, Tena earned $6,800 with Jeffery earning $105,000; in 2006, Tena earned $15,000 and Jeffery earned $103,000; and in 2007, Tena earned between $15,000 and $16,000. Jeffery testified that he thought his gross income for 2007 was $115,000. Although Jeffery insists that “[t]he chancellor should have considered the validity of Tena’s claim that a hairdresser with approximately twenty-one years experience can only make $15,000 per year,” there is nothing in the record that would disprove the veracity of Tena’s statements concerning her earning potential. At trial, Tena testified that she had to purchase her own supplies; she detailed the percentage she was required to pay the shop owner; and she talked about the varying fees charged for the haircuts she performed. To support his claim that Tena was earning below her potential, Jeffery offers no more than
 
 *1260
 
 mere conjecture and speculation, based solely upon the length of time Tena has been a hairdresser. We find the insinuations unpersuasive, and we find no error in the chancellor’s decision to refuse to question Tena’s stated earnings or her earning potential. There is nothing in the record to indicate that Tena has lowered her income in order to attain a larger settlement from Jeffery or to prevent paying some familial obligation. Furthermore, her tax returns indicate that she has increased her earnings each year between 2005 and 2007. We also find Jeffery’s allegation that Tena has extravagant expenses is without merit.
 

 ¶ 28. Jeffery criticizes Tena for her motorcycle payment, her car note for the used car that she purchased after then-separation, and her credit card bill. He argues that she has “inflated her expenses with extravagant purchases and excessive credit card debt.” We will address each payment. First, the motorcycle was purchased during Tena and Jeffery’s marriage when they
 
 went together
 
 and purchased motorcycles.
 
 [5]
 
 Second, the car in question was a used car that Tena purchased after giving her unencumbered Honda to her daughter. Tena testified that she gave the car to her daughter because her daughter had recently divorced and was in need of transportation. Tena testified that she would be willing to sell both the motorcycle and the car. And third, Tena testified that her credit card bill, which amounts to a total indebtedness of $10,000, accumulated because she used it for personal expenses while paying her own bills during the marriage. Also, she testified that she uses the credit card to help support herself while in school. Jeffery counters Tena’s explanation for the credit card use declaring that the use was unnecessary because Tena receives financial assistance for school. In any event, Tena’s total monthly obligations for her car, motorcycle, and credit card were, at the time of the trial, approximately $631 per month. Although this amount may be currently “beyond her means,” we find this to be far from an
 
 extravagant
 
 lifestyle.
 

 2. The Health and Earning Capacities of the Parties
 

 ¶ 29. Tena suffers from depression and bleeding ulcers.
 
 [6]
 
 However, Tena makes no contention that she is unable to work. To the contrary, she testified that she is seeking to attain a degree in order that she may have a more stable and lucrative earning potential. There was no testimony or evidence presented that would indicate Jeffery has adverse health issues, nor is there an anticipated reduction in his earning potential. However, he testified that he experiences some fluctuations in his income due to periods of available, if not mandatory, overtime.
 

 S. The Needs of Each Party
 

 ¶ 30. It appears from the record that there are no special needs for either party besides the expenses listed on each party’s Rule 8.05 financial statement.
 

 J.
 
 Obligations and Assets of Each Party
 

 ¶ 31. Jeffery’s Rule 8.05 financial statement reflects a total monthly income of
 
 *1261
 
 $4,800, with total monthly expenses of $3,754; and Tena’s Rule 8.05 financial statement reflects a total monthly income of $1,400, with total monthly expenses of $1,779. The chancellor painstakingly detailed Tena’s and Jeffery’s property and obligations, which are discussed in detail below. However, briefly stated, the couple owned approximately thirty-five acres of land, a mobile home, and bank and retirement accounts. The chancellor determined the portions that were marital property, and then he divided the assets. After reviewing the record, we find that the chancellor did not err when identifying, valuing, and distributing the obligations and assets of the parties.
 

 5.
 
 Length of Marriage
 

 ¶ 32. Jeffery and Tena were married for four years.
 

 6. The Presence or Absence of Minor Children in the Home
 

 ¶ 33. No children were born to the marriage, and at the time of the divorce, Tena’s daughters were nineteen and twenty-three. Neither daughter lived with Tena at the time of the divorce. Jeffery has two sons who did not live with him and Tena.
 

 7. Age of the Parties
 

 ¶ 34. At the time of the divorce, Tena was forty-six and Jeffery was forty.
 

 8. The Standard of Living of the Parties, Both During the Marriage and at the Time of the Support Determination
 

 ¶ 35. As stated, Tena and Jeffery purchased approximately thirty-five acres and a mobile home, which was their marital domicile, during their marriage. Jeffery testified that the couple had enjoyed several vacations together. Although the parties maintained separate bank accounts and Tena testified that she paid most of her own bills, it does not appear from the record that the physical needs of either party were unmet. The mobile home and land were awarded to Jeffery, and he was to pay Tena half of the equity. Based upon the chancellor’s equitable division of the marital property, there is no indication that either party will struggle to maintain a comparable standard of living.
 

 9. Tax Consequences of the Spousal Support Order
 

 ¶ 36. Neither party has raised any argument related to tax obligations or consequences. Although not addressed in the divorce decree, both parties would be responsible for their own tax obligations. Tena’s taxable income would be increased by the amount of the alimony awarded, and Jeffery’s taxable income would be reduced by the amount of the alimony paid.
 

 10. Fault or Misconduct
 

 ¶ 37. Tena was granted a divorce on the ground of habitual cruel and inhuman treatment.
 

 11. Wasteful Dissipation of Assets by Either Party
 

 ¶ 38. Other than Jeffery’s accusation that Tena had destroyed some of the marital property after their separation, neither party claims that the other committed wasteful dissipation of assets. Likewise, the chancellor did not address this issue in his extensive findings of fact and conclusions oflaw.
 

 12. Any Other Factor Deemed by the Court to be Just and Equitable in Connection with the Setting of Spousal Support
 

 ¶ 39. The record suggests no other relevant factors for consideration.
 

 
 *1262
 
 ¶ 40. The chancellor directed Jeffery to pay Tena periodic alimony in the amount of $800 per month beginning on March 31, 2008, and ending on May 31, 2009, for a total alimony award of $4,200. The chancellor specifically noted the disparity of income between the parties, but he determined that Tena was not entitled to an award of long-term alimony benefits because both parties contributed to the failure of the marriage. After considering the twelve factors and the corresponding facts in the record, we find that the chancellor was neither manifestly wrong nor did he abuse his discretion when he awarded Tena $300 a month in alimony. “The award was not oppressive, unjust, or grossly inadequate.”
 
 Rodriguez v. Rodriguez,
 
 2 So.3d 720(¶ 41) (Miss.Ct.App.2009).
 

 ¶ 41. Jeffery correctly noted in his brief to this Court, the time frame for the alimony payments coincides with Tena’s anticipated graduation date, and he argues that “[t]he court did not explicitly state that the award of alimony was rehabilitative alimony, [but] ... it seems that [it was] intended ... to be rehabilitative in nature.” We agree. Although we find that the chancellor adequately applied the
 
 Amstrong
 
 factors, he titled the award of alimony incorrectly. The chancellor stated, “[Jeffery] is directed to pay periodic alimony in the amount of $300 per month up and until May 31, 2009.... ” The supreme court has held “that a chancellor may place a time limitation on periodic alimony ... [which] is called ‘rehabilitative periodic alimony’ for rehabilitative purposes .... [It will be upheld] as ‘rehabilitative periodic alimony’ instead of ‘periodic alimony.’ It is still the law in Mississippi that ‘periodic alimony’ cannot have a fixed termination date.”
 
 Hubbard,
 
 656 So.2d at 129-130 (citation omitted). The
 
 Hubbard
 
 court went on to explain, “rehabilitative periodic alimony, synonymous with ‘periodic transitional alimony’ ... is a separate and equitable tool for chancellors to use in their discretion....”
 
 Id.
 
 at 130. “[It] is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.”
 
 Id,.
 
 “‘Periodic alimony’ is for an indefinite period vesting as it comes due and modifiable. ‘Rehabilitative periodic alimony is modifiable as well, but [it] is for a fixed period of time vesting as it accrues.”
 
 Id.
 

 ¶ 42. We find the chancellor’s labeling of the alimony award was harmless error. Tena requested temporary, rehabilitative, permanent, and lump-sum alimony in her complaint. Likewise, in response to a question regarding her motivation for temporary alimony, Tena stated that she “would like some money to help [her] finish school.” The chancellor’s order relating to the alimony award indicates that he intended to assist Tena’s transition into a more lucrative and stable employment via an award of rehabilitative alimony, and the record supports the chancellor’s order. The
 
 Hubbard
 
 court clearly stated, we look “to the substance of the provision, and not the label.”
 
 Id.
 
 at 129 (citation omitted).
 

 ¶ 43. “The chancellor’s decision on alimony will not be disturbed on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error.”
 
 Mosley v. Mosley,
 
 784 So.2d 901, 909(¶ 36) (Miss.2001) (citation omitted). “The amount of alimony awarded is a matter primarily within the discretion of the chancery court because of ‘its peculiar opportunity to sense the equities of the situation before it.’”
 
 Id.
 
 (citation omitted) “A chancellor can award alimony payable in one lump sum or periodic alimony, payable monthly, or both, dependent upon the circumstances of the parties.”
 
 Id.
 
 Based upon the guidance of the
 
 Hubbard
 
 court, well-settled precedent, and the
 
 *1263
 
 evidence presented in the record, we find that the chancellor was not in error and was within his discretion to make the award of alimony, whether it is was called “periodic alimony” or “rehabilitative alimony.” This issue is without merit.
 

 III. WHETHER THE CHANCELLOR FAILED TO MAKE AN EQUITABLE DIVISION OF MARITAL ASSETS.
 

 ¶ 44. “It is well-established ... that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties.”
 
 Christopher v. Christopher,
 
 766 So.2d 119, 121(¶ 7) (Miss.Ct.App.2000) (citation omitted). The supreme court has set forth the following guidelines and instructed the chancery courts to support their decisions with findings of fact and conclusions of law for purposes of appellate review.
 
 See Ferguson v. Ferguson,
 
 639 So.2d 921, 929 (Miss.1994). The guidelines that the supreme court set forth for the chancellor to apply are as follows:
 

 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
 

 a. Direct or indirect economic contribution to the acquisition of the property;
 

 b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
 

 c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
 

 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
 

 3. The market value and the emotional value of the assets subject to distribution.
 

 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
 

 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
 

 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
 

 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
 

 8. Any other factor which in equity should be considered.
 

 This Court cannot contemplate every situation that may present itself in future cases; therefore, the Court will address other questions as they arise, taking into consideration that fairness is the prevailing guideline in marital division. For example, interspousal gifts are not a part of this factual situation. Chancellors will have to determine for this Court’s review whether an interspousal gift is a highly personal one or whether some type of property, i.e., stocks and bonds, may require something beyond a gift analysis.
 

 Ferguson,
 
 639 So.2d at 928-29. Jeffery contends that the chancellor’s simple recitation of the
 
 Ferguson
 
 factors and valúa
 
 *1264
 
 tion of the assets and division of the property was reversible error. Jeffery argues that we have no way of determining whether the chancellor applied the correct standard for equitable distribution. We disagree.
 

 ¶45. “The chancellor is not required to address each and every factor and may consider only the factors which he finds applicable to the marital property at issue.”
 
 Wells v. Wells,
 
 800 So.2d 1239, 1244(¶ 8) (Miss.Ct.App.2001) (citation omitted). “It is well-settled law that the courts, when making an equitable distribution of marital property, are not required to divide the property equally.”
 
 McLaurin v. McLaurin,
 
 853 So.2d 1279, 1283(¶ 11) (Miss.Ct.App.2003). When “reviewing a chancellor’s judgment, [in property division], this Court does not conduct a
 
 Ferguson
 
 analysis anew, but reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.”
 
 Phillips v. Phillips,
 
 904 So.2d 999, 1001(¶ 8) (Miss.2004). Unlike the recent case of Rodriguez, the case at bar does not reflect that the chancellor adopted verbatim one of the parties’ proposed findings of fact and conclusions of law. Therefore, we find no need to evaluate each individual
 
 Ferguson
 
 factor. If the chancellor had not made an independent evaluation, “this Court [would] ‘review the record de novo’ ... [to] ensure that the chancellor adequately performed his judicial function.... ”
 
 Rodriguez, 2
 
 So.3d at (¶ 10) (internal citations omitted). Instead, we will consider the record and the lengthy discourse committed to the discussion of property division included in the chancellor’s findings of fact and conclusions of law.
 
 [7]
 

 ¶ 46. After quoting the guidelines of
 
 Ferguson,
 
 the chancellor referenced the exhibits presented by the parties that listed all of the parties’ assets, both marital and non-marital. As stated in the facts above, the chancellor found the net equity of the marital domicile to be $111,608.51. He then awarded the marital domicile and real property to Jeffery, but he ordered Jeffery to pay half of that amount, $55,804.26, to Tena within ninety days. As discussed above, the property was purchased while the two were married; Tena made the down payments on the property; she made at least some of the payments during the marriage; and the two utilized the residence as their marital home. Both Tena and Jeffery testified that they performed the daily chores required to maintain the home. The record reveals testimony that they both helped to clear the land and to landscape the premises.
 
 [8]
 
 Although the parties disagree about the extent of each other’s involvement in the maintenance of the home and household duties, it is evident that both parties made substantial contributions to the accumulation and maintenance of the property. Also, the fact that Jeffery had the greater earning capacity and was able to make more of the monthly payments does not negate Tena’s contribution of the down payment as well as her making some of the monthly payments as she was able. We find that the chancellor did not abuse his discretion in awarding Tena half of the equity related to the couple’s real property-
 

 
 *1265
 
 ¶ 47. The chancellor then addressed the retirement plans of the parties. The chasm between the values of the parties’ retirement accounts is as wide as it is between their incomes. Tena was enrolled in the Public Employee Retirement System (PERS) prior to her marriage to Jeffery, and Jeffery was making contributions into two investment accounts with Chevron. As of June 30, 2007, Tena’s PERS statement reflected a balance of $6,668.63, and her total years of service was shown to be thirty-seven months. Tena was married to Jeffery for sixteen of those months. Accordingly, the chancellor determined that $2,883.73 was marital property, and that the remaining $3,784.90 was non-marital property. Jeffery was awarded $1,441.87, but to keep matters simple, the chancellor awarded Tena her entire retirement account and decreased Tena’s interest in Jeffery’s retirement account by the $1,441.87.
 

 ¶ 48. The chancellor noted that there were two aspects to Jeffery’s retirement plans. First, the court addressed the Chevron Retirement Plan, which had a five-year cliff-vesting schedule, but Jeffery had not met the five-year requirement. Due to their relatively brief marriage, Tena did not claim an interest in that part of Jeffery’s retirement plan. The second part of Jeffery’s retirement plan, and the primary one at issue, is his Chevron Employee Savings Investment Plan (ESIP). As of March 8, 2003, the ESIP was valued at $26,620.11, and on May 23, 2007, the ESIP’s value had increased to $146,517.83. In other words, during the marriage, Jeffery’s ESIP increased in value by $119,897.72. Given that the increase was marital property, it was subject to equitable distribution, and the chancellor awarded Tena $59,948.86. The court reduced this award by $1,441.87 to credit Jeffery for his interest in Tena’s PERS retirement account. Tena was ultimately awarded $58,506.99 of Jeffery’s ESIP account. The supreme court has held that “for purposes of divi[d]ing marital property, retirement plans are considered martial [sic] assets.”
 
 Phillips,
 
 904 So.2d at 1002(¶ 9). And, “[this Court] [has] routinely upheld an equitable division of one-half of the marital assets where warranted by the facts and circumstances.”
 
 Id.
 
 at 1003(¶ 13).
 

 ¶ 49. Tena and Jeffery had individual bank accounts. At the time of the divorce, Tena’s combined balance of her checking and savings accounts was $200, and Jeffery had savings, checking, and money market accounts totaling $35,772.58. The chancellor noted that “although the parties maintained separate bank accounts, much of their monies were commingled for marital purposes.” Accordingly, the court awarded Tena half of Jeffery’s accounts but reduced the award by the $200 because Tena had been allowed to keep the money in her bank accounts. Both Tena and Jeffery were ordered to pay for their own credit card debt. We find that Jeffery’s argument that Tena “only contributed minimally to the accumulation of marital property” is without merit.
 

 ¶ 50.
 
 Ferguson
 
 clearly states, “contributions of domestic services are not made directly to a retirement fund, [but] they are- nonetheless valid ... contributions which indirectly contribute to any number of marital assets, thereby making such assets jointly acquired.... [I]t must be remembered, the goal of the chancellor in a divorce case is to do equity.”
 
 Ferguson,
 
 639 So.2d at 934. This was echoed by the supreme court case wherein the court stated, “[i]n determining a spouse’s contribution which justifies equitable distribution, we look not only at cash contributions and assistance in the spouse’s workplace or business, but also to domestic work in the home such as caring for children, cooking meals, cleaning house, and washing and
 
 *1266
 
 ironing clothes.”
 
 Haney v. Haney,
 
 907 So.2d 948, 955(¶ 27) (Miss.2005). Likewise, in
 
 Pittman v. Pittman,
 
 791 So.2d 857, 862(¶ 10) (Miss.Ct.App.2001), we stated that a “spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other may claim an equitable interest in such jointly accumulated property.”
 

 ¶ 51. Jeffery contends that Tena worked and was never a “housewife,” but we find that argument unpersuasive. The end result of Jeffery’s arguments is that Tena should not be credited for working and contributing financially, because it was a “minimal” amount, nor should she be credited for her domestic contributions, because she worked and was not a “housewife.” This rationale would certainly place Tena in an inequitable lose-lose situation. A detailed review of the record makes it apparent that both parties contributed to the marital disharmony. However, they both testified that there were some good times during the marriage. Both Tena’s and Jeffery’s contributions to the accumulation and maintenance of the marital property should be credited.
 

 ¶ 52. Without conducting a
 
 Ferguson
 
 analysis anew, we have reviewed the chancellor’s findings of fact and conclusions of law, as well as a thorough review of the record, and we find that the chancellor did not abuse his discretion or commit manifest error when he considered both parties’ contributions and crafted an equitable distribution of Tena and Jeffery’s marital property.
 

 IV. WHETHER THE CHANCELLOR ERRED IN REQUIRING JEFFERY TO MAINTAIN MEDICAL INSURANCE COVERAGE ON TENA IN ADDITION TO THE AWARD OF ALIMONY.
 

 ¶ 53. Jeffery was ordered to continue to pay for Tena’s COBRA insurance coverage, and it was classified as alimony. The chancellor stated that this was due to Tena’s health condition. Tena gave undisputed testimony that she suffered from bleeding ulcers and depression; had ongoing pain in her arm, stemming from an earlier auto accident; and was still paying medical bills relating to her motorcycle accident. Jeffery was ordered to pay for the insurance for thirty-six months. This was in addition to the $300 per month for fourteen months that Jeffery was to pay in alimony. Once again, Jeffery contends that the chancellor committed manifest error in awarding the insurance coverage, and he erred by not making adequate findings of fact and conclusions of law. However, this argument is not consistent with
 
 Ferguson.
 
 In
 
 Ferguson,
 
 the court also required the husband to maintain insurance for his ex-wife through his employer’s COBRA plan for as long as the law allowed. In
 
 Ferguson,
 
 the husband contended that the chancellor abused his judicial discretion in ordering him to provide his ex-wife with health and hospitalization insurance through his employer while awarding the ex-wife periodic, continuing, or permanent alimony.
 
 Ferguson,
 
 639 So.2d at 936. The
 
 Ferguson
 
 court stated, “the chancellor was not manifestly wrong in ordering Billy to maintain insurance on Linda under the Bell South COBRA plan for as long as the law allowed. Linda is eligible for COBRA coverage for thirty-six (36) months from the time of her divorce from Billy.”
 
 Id.
 
 The case at bar is the same situation.
 

 ¶ 54. Although Jeffery recognizes that a chancellor is authorized to order a spouse to continue to provide insurance, he claims that it is normally reserved for spouses with serious and costly medical conditions. Jeffery cites
 
 Haney
 
 for this proposition, but it is not apparent that the
 
 *1267
 
 supreme court made such a ruling. In
 
 Haney,
 
 the wife had requested an award of temporary support which included $130 per month for health insurance premiums.
 
 Haney,
 
 907 So.2d at 955-56(¶ 31). Rather than stating that serious and costly medical conditions are normally required for the maintenance of insurance to be ordered, the court simply stated, “[t]he chancellor granted Pat’s request, and Bob made the payments as ordered. Pat made no request for an order requiring Bob to keep her insured on his group policy. Thus, we are unable to find in the record any basis for holding these medical bills against Bob.”
 
 Id.
 
 In other words, the husband in
 
 Haney
 
 was not responsible for his ex-wife’s medical bills because he had paid for the wife’s insurance temporarily, as ordered by the court, but the wife had made no request for an order requiring her ex-husband to keep her on his insurance policy .for an extended period of time. In the instant case, Tena has ongoing medical problems, and we find no error in the chancellor’s order requiring Jeffery to keep Tena insured for thirty-six months. Based upon a detailed review of the record and the chancellor’s findings of fact and conclusions of law, we affirm the chancellor’s judgment.
 

 ¶ 55. THE JUDGMENT OF THE CHANCERY COURT OF GEORGE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Tena and Jeffery recalled the number of separations differently. Jeffery testified that Tena left approximately ten times, and Tena remembers four. Regardless of whom is accurate, it is apparent the couple's relationship was far from harmonious.
 

 [2]
 

 . The vehicle given to Tena’s daughter was a different vehicle than the one Jeffery paid for, but Jeffery takes issue with the gift because Tena owned the car debt free. The gift created the need for Tena to purchase another vehicle. Therefore, Jeffery claims that Tena intentionally inflated her lifestyle with extravagant purchases and expenses.
 

 [3]
 

 . Tena presented photographs depicting her with a black eye, which she testified was caused by Jeffery. Jeffery denied die accusation.
 

 [4]
 

 . The
 
 Hubbard
 
 court stated:
 

 Our law vests in the chancery courts of this state broad authority to provide for the material needs of spouses incident to divorce. ... [And] our cases have recognized several general forms of aid including, but not limited to: (a) periodic alimony ... (b) lump-sum alimony ... (c) division of jointly accumulated property; and (d) award of equitable interest in property.
 

 Hubbard,
 
 656 So.2d at 129.
 

 [5]
 

 . The parties testified that they both purchased motorcycles, but Jeffery paid for his, and Tena paid for hers. Tena later had a motorcycle accident wherein she experienced a knee injury that required surgery. This accident led to additional medical bills for Tena.
 

 [6]
 

 . Tena testified that she suffers from three bleeding ulcers, as well as depression, and her medicine expenses are approximately $200 per month.
 

 [7]
 

 . The chancellor’s findings of fact is approximately sixteen pages long, with six of those pages committed to the chancellor's determination of what was marital property, the value of that property, and the distribution of that property.
 

 [8]
 

 . Tena testified that she helped Jeffery clear the land; she helped plant approximately forty crepe myrtle trees; and she assisted Jeffery in constructing a pole barn.