# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00710-COA

**CODY WALTON WOODS**                                              **APPELLANT**

**v.**

**SAVANNAH MAE (HASLIP) WOODS**                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2024 |
| TRIAL JUDGE: | HON. ROBERT Q. WHITWELL |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES GREGORY DAVIS TAYLOR ALLISON HECK |
| ATTORNEY FOR APPELLEE: | JERRY WESLEY HISAW |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 10/28/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Cody Woods and Savannah Haslip Woods were married on April 3, 2021, but had lived together since 2012. The couple separated in 2023, and Cody filed for divorce. Savannah did not contest the ground for divorce in Cody's complaint. The chancellor then moved forward to conduct the marital property division. After trial, the chancellor awarded Cody the title and possession of the couple's lake house and awarded Savannah equity from the lake house in the amount of $47,500.00. The chancellor also awarded Savannah $10,000.00 as a "leveling payment" from Cody's 401(k) and investment accounts. Aggrieved, Cody appeals, alleging that the "chancellor erred" in his determination of the

"equity in the home" and in his "equitable division for [the couple's] 401k and investment funds."

**FACTS AND PROCEDURAL HISTORY**

¶2.     Cody and Savannah had lived together as a couple since 2012. On April 3, 2021, they were married in Tate County, Mississippi. The couple separated on February 2, 2023, in Marshall County, Mississippi. On February 28, 2023, Cody filed for divorce. On May 10, 2023, an agreed temporary order was entered in which Savannah stipulated that Cody was entitled to a divorce on the ground of adultery and reserved for the court to determine the issue of property division. The trial occurred on April 11, 2024.

¶3.     Cody was the first witness to testify. He testified that he was the owner of three companies: CW Developments Inc., C Woods Electric Inc., and Wood HVAC LLC. He testified that the monies from the three companies were "very co-mingled," and it was "very hard to distinguish what [went] in and out" of each company.

¶4.     Cody testified that in 2012, a house was purchased on Red Banks Road in Byhalia, Mississippi, and titled in his brother Jared Woods's name. Cody testified that he titled the house in Jared's name because he "was trying not to mess up any kind of offer in compromise that [he] had with the IRS." Cody explained that he was not trying to "necessarily hide anything, but it would have started the whole process over." Although the house was deeded to Jared, Cody and Savannah lived in the house and made all the mortgage payments on the Red Banks house, which Cody testified that either he or his businesses made.  Cody also testified that in October 2015, Savannah moved out of the Red Banks

2

house, but she moved back in July 2016.

¶5.    In 2018, the couple purchased a double-wide trailer in Iuka, Mississippi. The couple sold it a year later and deposited the sale proceeds in a joint account. The sale proceeds were used to pay the remaining notes on the lake house the couple bought in 2015. In 2019, the couple purchased a lake house in Iuka for $920,000.00. They were not married at the time of the lake house purchase, but both of their names were on the deed. Cody testified that Cody and Savannah "needed to show equity in [the Red Banks home] in order for [them] to purchase the . . . lake house" because Cody was in the process of an offer to compromise with the IRS due to "some past tax issues with Woods Electric." Cody testified that in order to show equity in the Red Banks house, Jared "quit-deeded [the Red Banks home] to Savannah right before [Cody and Savannah] purchased the lake house." Cody explained that he decided to put his name on the deed because the offer to compromise with the IRS was settled the day of the closing for the lake house.

¶6.    Cody also testified that a total down payment of $198,204.00 was required for the lake house closing. He testified that $96,500.00 of the $198,204.00 came from a check that was written out to Cody from a job he profited from. Cody testified that he deposited that check into Savannah's personal account. Cody also testified that $34,500.00 came from another check that Cody deposited into Savannah's account and had been written out to Cody. He explained that $23,000.00 came from a certified check that had been written out to Cody and deposited into Savannah's account for a side-by-side that Cody had sold. Cody testified that Savannah contributed $16,800.00 toward the down payment, which came out of her 401(k).

Lastly, Cody provided $40,000.00 in cash at closing and put down $7,500.00 in earnest money.

¶7.    Cody testified that after they closed on the lake house, he and Savannah used the $40,000.00 they made from selling the double-wide trailer in Iuka to make the payments on the lake house for seven months. After those seven months, Cody testified that he made the rest of the payments on the lake house.

¶8.    Cody testified that the lake house was appraised for $898,500.00, and the principal balance due on the lake house balloon mortgage was about $673,000.00, which left $225,500.00 in equity. Cody also explained that there was $38,000.00 worth of taxes owed on the lake house and an approximate $7,017.00 owed in insurance. Cody testified that after the appraisal was complete, repairs on the house were needed.[1] Cody explained that the center block wall needed to be repaired because it leaked and caused black mold, which was estimated to cost $14,850.00. Roof damage from a tree limb that went through the roof was estimated to cost $15,900.00. Roof leak damage was estimated to cost $1,875.00. The exterior wood needed to be replaced and repainted, which was estimated to cost $10,450.00. One of the "heat pumps" was not working properly and would cost $4,333.50 to replace. The dock needed to be repaired, which was estimated to cost $1,185.37 to be fixed. Lastly, the septic tank was not working properly and was estimated to cost $24,000.00 to repair and replace. Cody testified that the total cost of the improvements and repairs to the lake house would equal approximately $106,000.00.

---

[1] The June 8, 2023, appraisal stated: "No needed repairs observed."

4

¶9.    Cody testified that he and Savannah sold the Red Banks house on March 7, 2021, four days after they were legally married. Cody testified that once he and Savannah "learned [they] sold the [Red Banks] house, [Cody] started building an apartment in the upstairs portion of his office building." Cody received a $100,000.00 line of credit in order to finish the apartment because they "were in a time crunch" to finish it; they needed a place to live after they closed on the Red Banks house. The couple received a check in the amount of $332,426.78 from the equity in that house. The sale proceeds check was made out to Savannah and placed in her bank account. He also stated that a portion of the sale proceeds was used to pay back the line of credit. Cody testified that the sale proceeds were also used to purchase a 2021 Chevrolet Corvette for $116,000.00, a 2022 Veranda Tritoon boat and trailer for over $50,792.00, and other household furniture and goods for the lake house and apartment.

¶10.    Cody explained that Savannah worked for him from 2019 to 2023, "handl[ing] all the taxes and payroll for . . . all three [of Cody's] companies." Cody explained that Savannah "received $850.00 from each company, less taxes, a week," which totaled $44,000.00 a year. Cody testified that after he and Savannah separated, "she left her job." Cody hired an accountant who discovered Cody had "about a 150[,000.00] to $175,000.00 tax issue . . . [w]ith the IRS and the State of Mississippi" from 2010 to the time Savannah left in 2022. Cody testified that in April 2023, he took out a loan in the amount of $150,144.50 from the bank to pay off a portion of the IRS bill, and he paid the remainder off with "company income." In order to secure the loan from the bank, Cody had to collateralize his two boats,

one of which was bought with a portion of the sale proceeds from the Red Banks house, and his Corvette, all of which were purchased during their marriage.

¶11. Tracy Hefner was also called to testify. Tracy was an employee of Cody's companies and replaced Savannah's position. Tracy testified that she was trained by Savannah and did the "payroll, insurance, . . . taxes, [and] invoicing." After Tracy became Cody's employee, she was informed that the company was behind on its taxes. She stated that the company took out a $150,000.00 loan to pay the taxes. Tracy also testified that the company received a letter in the mail stating "that the taxes for 2021 were going into collection, and it's $30,000.00[,]" which would be a payment in addition to the $150,000.00.

¶12. Cody's brother Jared also testified. He testified that the deed to the Red Banks home was in his name, but he did not make any payments on it. Jared explained that his name was on the deed to the Red Banks home because "[Cody] owed money to the IRS," so Cody could not put the house in his name to avoid having assets in his name. Further, he stated that in 2019, Jared "went to an attorney and did a quick deed" to transfer that house to Savannah.

¶13. Savannah also testified. Starting in April 2019 she was employed by Cody's businesses as the office manager. She handled the payroll, insurance, taxes, and invoices, but she did not have any training in accounting, bookkeeping, or tax law. She testified that she "basically trained [her]self." She explained that before she worked for Cody, she had worked at Baptist Memorial Hospital as a registered polysomnographic technologist.

¶14. Savannah prepared the tax returns while she worked for Cody's companies, and "as far as [she knew]" the tax returns were filed. However, she testified that all the taxes were

6

not paid because "there was no funds to pay the taxes, and [she] was not allowed or authorized to make any payments without Cody's consent." Savannah testified that the taxes would have been paid if there had been money available to pay them.

¶15.     Savannah also testified that she originally did not know whose name the Red Banks house was titled in. She became aware the house was titled in Jared's name in 2015 when she moved back into the home with Cody after their first separation.  Savannah testified that in 2019, the house was transferred solely to her name because she refused to live there if her name was not on the deed.  Savannah testified that it was Cody's idea for Jared to transfer the house solely to Savannah rather than to both of them. Converse to Cody's testimony, Savannah testified that the Red Banks house was not a part of the equity that was used to buy the lake house.

¶16.     Savannah testified that she designed the apartment the couple moved into after they sold the Red Banks house.  She "picked out all the decor, furniture, cabinets, [and] colors" and "basically [decorated] all of it."  Savannah testified that the purchases for the apartment came out of her bank account, and she was not "aware" of any purchases made by Cody regarding the apartment.

¶17.     Savannah testified that she and Cody bought the Iuka lake house together in 2019 before they were married and "live[d] there when [they] were married."  Savannah testified that Cody put $158,000.00 into her bank account to use for a portion of the down payment. Savannah explained that "[Cody] told [her] that [money] was [her] equity in it because he needed a co-signer." Savannah also testified that she took out $16,000.00 "out of her 401(k)"

7

to help contribute to the down payment. She testified that after they were married, the couple only put $4,000.00 into decorating and fixing up the lake house. Savannah also testified she handled all the upkeep of the lake house. The couple listed the lake house with Airbnb, and Savannah was responsible for maintaining the listings, scheduling, cleaning, and purchasing of items such as bed sheets and decor. Savannah testified that Cody's company paid the property tax for the lake house, and Savannah said she was unaware that the 2021 or 2022 taxes had not been paid.

¶18. Savannah also testified that after the temporary order was entered on May 10, 2023, Cody had exclusive use and possession of the lake house. Savannah explained that she had only been to the lake house once since the temporary order was filed and did not know about the busted pipes or the fallen tree limb on the roof. She testified that it was her understanding that insurance would have paid for the broken pipes and the tree-limb damage. Savannah also testified that before closing, Cody noticed the septic tank overflowing, and he informed the previous owner. At closing, Cody made an agreement with the previous owner, who gave Cody $7,500.00 out of the $40,000.00 cash which Cody used as money for the down payment to fix the septic tank issue. However, Savannah testified that the septic tank was never fixed and continued to overflow. As of June 6, 2023, the lake house's appraised value was $898,500.00.

¶19. Cody was called back to testify. He testified that on multiple occasions, before he and Savannah were legally married, he would put thousands of dollars into Savannah's bank account. He explained that he gave her money because he "trusted her" and when there

8

"were times that [he] made good on jobs" he would put money in Savannah's account, and [they] would go make large purchases." He testified that "it was honestly a trust thing," and that "was the reason" why he put money into her account. Cody also testified that "[he] would have never gifted or gave somebody [$158,000.00] for them to have equity in a house" because that "doesn't make good sense."

¶20. Cody further testified that at "no point" would it have been important for him to hide money from the IRS. Cody explained that the Red Banks house was deeded to his brother because Cody "was trying not to mess up any kind of offer in compromise that [Cody] had with the IRS." Cody "wasn't trying to necessarily hide anything, but" if his name was on the deed, "it would have started the whole process over."

¶21. On May 23, 2024, the chancellor granted the divorce and determined the equitable distribution of their marital assets and debts. In the chancellor's judgment, he stated:

> Though Cody Woods' three businesses are separate, non-marital assets, there were significant sums of money transferred from Cody's business bank accounts into Savannah's personal bank account both prior to and during the marriage. From the proof presented, these funds were commingled by Cody and Savannah, and this commingling of non-marital and marital assets complicates this Court's analysis and distribution of the parties' marital estates.

¶22. The chancellor awarded the title and possession of the Iuka lake house to Cody and ordered him to be responsible for all indebtedness, taxes, insurance, and all needed repairs. The chancellor awarded Savannah equity from the lake house in the amount of $47,500.00, which was to be payable to Savannah by July 1, 2024. The chancellor allotted the remaining

9

$56,192.30 to Cody.[2] By July 1, 2024, Cody was required to refinance or otherwise fully satisfy the $658,620.95 balloon mortgage payment that was due. The chancellor "believe[d] the land and other funds used to purchase the Iuka Lake House were placed in Savannah's name to avoid attachment by the IRS before Cody's tax issues could be settled." Therefore, the chancellor found that "the funds used to buy the Iuka Lake House were held in trust by Savannah and were not a gift to her."

¶23. The chancellor awarded Savannah $20,000.00 for her equity in the apartment, and Cody was awarded the remaining equity and full ownership of the apartment. The chancellor also awarded Savannah $7,500.00 of her equity in the Veranda Tritoon boat. Cody was awarded the remaining equity in and ownership of those assets. The chancellor found that while Cody and Savannah both had financial needs, "Cody has significant debt burdens with the Lake House balloon payment[,] . . . unpaid property taxes, needed repairs to the Lake House, and his approximate $150,000.00 loan to cover his most recent tax issues."

¶24. Lastly, the chancellor created a chart to demonstrate the parties' yearly contributions, gains, losses, and balances of their individual 401(k) retirement accounts. *See infra* ¶44. The chancellor awarded Cody and Savannah their respective 401(k) and investment accounts. Additionally, the chancellor ordered that Cody pay Savannah $10,000.00 as a "leveling payment from the 401k and investment accounts." On June 18, 2024, Cody filed a notice of appeal.

---

[2] The chancellor determined the equity in the lake house was $103,692.30 by taking the house's appraised value of $898,500.00 and subtracting the $658,620.95 balloon payment, the $29,763.30 unpaid ad valorem taxes and annual insurances premiums, and the $106,423.45 repairs.

**STANDARD OF REVIEW**

¶25.   "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011) (citing *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000)).   This Court "will not disturb a chancellor's factual findings unless the chancellor's decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard." *Id.*   Even if we disagree with the findings of fact and would arrive at a different outcome, "[w]e do not substitute our judgment for that of the chancellor." *Id.*   When reviewing a chancellor's interpretation and application of the law, our standard of review is de novo. *Id.*

**ANALYSIS**

¶26.   On appeal, Cody argues that the chancellor erred by (1) finding the Iuka lake house was marital property; (2) finding there was equity in the Iuka lake house that should be distributed; (3) finding that Savannah was entitled to a portion of the lake house equity when Cody had paid the down payment; and (4) awarding Savannah the $10,000.00 "leveling" payment from Cody's retirement account.

> **I.     Whether the chancellor erred by finding the Iuka lake house was marital property.**

¶27.   Cody first argues the chancellor erred by determining that the Iuka lake house was marital property because the home was purchased before the couple got married. He also asserts it "was not used by Cody and Savannah for family use," and there was "no

11

commingling of funds between the two parties" regarding the lake house. Property division for divorce cases is governed by the law articulated in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994). It should be noted that "[f]airness is the prevailing guideline in marital division." *Id.* at 929.

¶28.    In order to equitably distribute a couple's assets, the chancellor must first determine whether each asset is marital or non-marital. *Id.* Marital property is "any and all property acquired or accumulated during the marriage." *Cannon v. Cannon*, 375 So. 3d 697, 710 (¶43) (Miss. Ct. App. 2023) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)). Property that is excluded from that definition is considered separate property. *Id.* Separate property is property that is "attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Hemsley*, 639 So. 2d at 914. "Property that was once separate may convert to marital property under the family-use doctrine." *Rhodes*, 52 So. 3d at 438 (¶2).

¶29.    Once the marital and separate property are distinguished, "[c]hancellors apply the *Ferguson* factors to marital property to make an equitable distribution of the property." *Ward v. Ward*, 131 So. 3d 1244, 1248 (¶13) (Miss. Ct. App. 2014). Those factors follow:

> (1)    substantial contribution to the accumulation of the property, under which the chancellor should consider
>    (a)    the parties' direct or indirect economic contribution to the acquisition of the property,
>    (b)    the parties' contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties, and duration of the marriage, and
>    (c)    the contribution to the education, training or other accomplishments by the other spouse bearing on the earning power of the spouse accumulating the assets;

12

(2)    the degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise;

(3)    the market value and the emotional value of the assets subject to distribution;

(4)    absent equitable factors to the contrary, the value of assets not ordinarily subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

(5)    tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

(6)    the extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

(7)    the needs of the parties for financial security with due regard to the combination of assets, income and earning capacity, and

(8)    any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928. "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006). Notably, "an **equitable** division of property does not necessarily mean an **equal** division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994) (emphasis added). "Rather, **fairness** is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929 (emphasis added).

¶30.    Lastly, there is a presumption that property acquired during the marriage is marital property. *Yancey v. Yancey*, 752 So. 2d 1006, 1011 (¶20) (Miss. 1999) (citing *Maslowski v. Maslowski*, 655 So. 2d 18, 20 (Miss. 1995)). The burden of proof is on the spouse that claims the property is separate rather than marital. *See Horn v. Horn*, 909 So. 2d 1151, 1165 (¶50) (Miss. Ct. App. 2005) (citing *Hemsley*, 639 So. 2d at 914)). "This burden goes beyond a

13

mere demonstration that the asset was acquired prior to marriage." *A & L Inc. v. Grantham*, 747 So. 2d 832, 839 (¶23) (Miss. 1999).

¶31.    Savannah cites *Rhodes v. Rhodes*, 52 So. 3d 430 (Miss. Ct. App. 2011), in support of the chancellor's decision to consider the Iuka lake house as marital property. In *Rhodes*, a couple, Rocky and Stacey, were granted a divorce. *Id.* at 433 (¶1). Stacey argued that the chancellor erred by finding that the couple's Florida vacation home Rocky had purchased three years before the marriage remained his separate property. *Id.* at 433-34 (¶1). The couple was dating at the time Rocky purchased the house, and Stacey participated in selecting the home. *Id.* at 439 (¶30). Rocky, Stacey, and Stacey's daughter used the vacation home substantially during the marriage. *Id.* at 434 (¶2). Furthermore, Stacey had an active role in improving and maintaining the vacation home during their marriage. *Id.* at 439 (¶31). For example, Stacey pressure-washed the house, performed various improvement projects on the house, and she took part in securing rent-paying tenants to live in the house. *Id.* Stacey also "picked out everything" and purchased various items for the house. *Id.* Rocky, however, made all the financial contributions to the vacation home. *Id.* at 440 (¶34). This Court, citing *Pittman v. Pittman*, 791 So. 2d 857, 862 (¶10) (Miss. Ct. App. 2001),[3] stated that "one spouse's contribution of all the funds necessary for the purchase [of real property] does not guide the court in determining [its] marital or separate . . . character." *Id.* This Court also cited *Hemsley*, 639 So. 2d at 915, and stated:

Considered in isolation, one spouse's financial contribution to the property

---

[3] *Overruled on other grounds by Collins v. Collins,* 112 So. 3d 428, 432 (¶11) (Miss. 2013).

14

reveals little about the familial use or other contributions. Financial contributions must be considered in the context of other equitable considerations, such as the non-financial contributions of the other spouse, which are presumed equal to those of the primary wage-earner.

*Rhodes*, 52 So. 3d at 440 (¶34). This Court reversed the chancellor's classification of the vacation home as non-marital property and held that the family's use of the vacation home was sufficient and warranted its inclusion in the marital estate. *Id.* at (¶¶33, 37).

¶32. Similarly here, Cody and Savannah were dating and not married when the lake house was purchased. However, unlike in *Rhodes*, the lake house was jointly purchased by and deeded to Cody and Savannah. Even though the chancellor found that Cody funded "most of the down payment," the chancellor also found that Savannah and Cody both contributed financially to the lake house. Cody and Savannah both admitted that Savannah took money from her 401(k) retirement account to contribute to the down payment. Savannah also contributed in non-financial ways. She testified that "[she and Cody] did live [at the lake house] when [they] were married," and she had an active role in maintaining and improving the house by running the listing and scheduling of renters through Airbnb. Savannah also testified that she handled all the decorating and cleaning of the lake house. While Savannah's financial contributions may or may not have been equal to Cody's financial contributions, it is **equity, not equality**, that is the prevailing guideline in determining equitable distributions. *See Ferguson*, 639 So. 2d at 929. We find substantial evidence to support the chancellor's finding. The home was jointly titled, reflecting shared ownership, and Savannah and Cody both actively contributed to its upkeep and maintenance throughout the marriage.

15

**II.	Whether the chancellor erred in finding equity in the Iuka lake house that could be distributed.**

¶33.	Cody also argues that even if the lake house is marital property, "there is no equity to be equally distributed." He argues first that the chancellor erred when he used the final balloon mortgage payment of $658,620.95 when calculating the equity in the house. Cody's argument is that the chancellor should have included payments of principal and interest from May 24, 2024, and June 24, 2024, which would have made the mortgage $668,759.29, rather than $658,620.95, which would have made the equity $229,740.71 instead of $239,879.05.

¶34.	"Under the system of equitable distribution, the courts in Mississippi are not so inhibited." *Hensarling v. Hensarling*, 824 So. 2d 583, 590 (¶21) (Miss. 2002). "The matter rather is committed to the discretion and conscience of the [c]ourt, having in mind all of the equities and other relevant facts and circumstances." *Id.* (citing *Chamblee*, 637 So. 2d at 864; *Brown v. Brown,* 574 So. 2d 688, 691 (Miss. 1990)). The Mississippi Supreme Court has held that "the chancellor's discretion in the area of equitable distribution is exceedingly broad and he 'has the flexibility to do what equity and justice requires.'" *Hensarling*, 824 So. 2d at 590 (¶21) (quoting *Chamblee*, 637 So. 2d at 864).

¶35.	The chancellor used the "impending balloon payment" of $658,620.95 as the valuation of the mortgage to determine the equity in the lake house. This amount was shown on the loan estimate document, which reflected all principal and interest payments owed on the loan through its maturity.

¶36.	Cody also asserts the chancellor erred when calculating the unpaid taxes, insurance, and costs and expenses for needed repairs on the lake house when determining the equity.

16

Cody contends that the chancellor "made a manifest error [by] stating that there were only two" years of unpaid ad valorem taxes because Cody believes "there are at least three years of ad valorem taxes" and annual insurance premiums that total $38,365.09, rather than $29,763.30, as the chancellor determined. Cody also contends that the chancellor erred when he found that the needed repairs were estimated to cost $106,423.45, while Cody claims the "total cost of repairs actually add[ed] up to $112,135.06."

¶37. "[A chancellor's] findings on valuations 'may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the **testimony,** or in other evidence.'" *Marter v. Marter*, 95 So. 3d 733, 739 (¶20) (Miss. Ct. App. 2012) (emphasis added) (quoting *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011)); *see also* UCCR 8.05. "[W]hen a chancellor makes a valuation judgment based on proof that is less than ideal, it will be upheld as long as there is some evidence to support [her] conclusion." *Messer v. Messer*, 850 So. 2d 161, 170 (¶43) (Miss. Ct. App. 2003) (citing *Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶29) (Miss. Ct. App. 1999)). This Court "does not re[-]evaluate the evidence, re[-]test the credibility of witnesses, nor otherwise act as a second fact-finder." *Cox v. Upchurch*, 301 So. 3d 69, 73 (¶13) (Miss. Ct. App. 2020) (citing *Belding v. Belding*, 736 So. 2d 425, 427 (¶5) (Miss. Ct. App. 1999); *Wright v. Stanley*, 700 So. 2d 274, 280 (Miss. 1997)). "Unless the chancellor was **manifestly wrong, clearly erroneous or applied an erroneous legal standard**, we will affirm." *Id.* (emphasis added). According to the Mississippi Supreme Court, "[i]f there is substantial evidence in the record to support fact-findings, no matter what contrary evidence there may also be, the appellate court will

uphold the chancellor." *Id*. (citing *Smith v. Jones,* 654 So. 2d 480, 485 (Miss. 1995)). "The chancellor, by his presence in the courtroom, is best equipped to listen to the witnesses, observe their demeanor, and determine their credibility and what weight ought to be ascribed to the evidence given by those witnesses." *Id.* (citing *Rogers v. Morin*, 791 So. 2d 815, 826 (¶39) (Miss. 2001)).

¶38.    Here, Cody testified at trial that the ad valorem taxes and insurance on the lake house were delinquent.  Cody argued that the chancellor "stated that there were only two" years of unpaid ad valorem taxes.  But the chancellor found "[t]here are **at least** two years of unpaid ad valorem taxes and an annual insurance premium that Cody says totaled $29,763.30." (Emphasis added).  Further, the chancellor found:

> Cody also testified at trial that ad valorem taxes and insurance on the Iuka Lake House are delinquent and owing. The taxes are for 2021 and 2023, and possibly 2022. The 2020 taxes appear to have been redeemed on August 11, 2023, just prior to a tax certificate maturing. According to counsel, the current property tax and insurance premium balance is $29,767.30.

There certainly is sufficient evidence to support the chancellor's findings for the taxes owed and insurance premiums owed.

¶39.    The chancellor used the repair estimate of $106,000.00 to determine the equity in the lake house.  Cody's brief to this Court lists the home repair and improvements that were approved by the chancellor at $112,135.06.  However, while testifying, Cody was asked if he was "asking for credit of $106,000.00 worth of repairs and renovations" for the lake house, and he responded "yes."  The chancellor found that "the financial liability for some of the[] repairs could have been offset by the parties' homeowner insurance[,] . . . but neither

18

party filed a claim for such." The chancellor further found that neither Cody nor Savannah was willing or able to make any of the repairs themselves. Again, "[i]f there is substantial evidence in the record to support fact-findings, no matter what contrary evidence there may also be, the appellate court will uphold the chancellor." *Cox*, 301 So. 3d at 73 (¶13). Upon review, we cannot say the chancellor was manifestly wrong, clearly erroneous, or applied an incorrect legal standard because there was sufficient evidence in Cody's testimony that the repairs would cost approximately $106,000.00. *See id.* We therefore affirm the chancellor's equity determination.

### III. Whether the chancellor erred by finding that Savannah was entitled to a portion of the lake house equity even though Cody paid the down payment.

¶40. Cody asserts that if this Court finds equity in the lake house, it should be distributed to him to recover the large down payment he made in the amount of $193,500.00. As previously stated, the law presumes that property that is acquired during a marriage is marital property. *See Yancey*, 752 So. 2d at 1011 (¶20). "It is well-established . . . that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties." *Goellner v. Goellner*, 11 So. 3d 1251, 1263 (¶44) (Miss. Ct. App. 2009) (citing *Christopher v. Christopher*, 766 So. 2d 119, 121 (¶7) (Miss. Ct. App. 2000)). Further, Mississippi courts have previously held that separate funds used to invest in a marital home are considered commingled funds. *Henderson v. Henderson*, 703 So. 2d 262, 265 (¶16) (Miss. 1997).

¶41. In *Goellner*, this Court addressed the equitable distribution of marital property,

including the treatment of down payments made by one spouse during the marriage. *Goellner*, 11 So. 3d at 1253 (¶1). Jeffery and Tena Goellner jointly owned two parcels of land. *Id.* at 1254 (¶6). The couple purchased one property for $33,600.00 and another property for $24,500.00. *Id.* Tena paid a down payment of $9,990.00 for one property and $7,000.00 for the other. *Id.* Tena also paid $13,000.00 for a mobile home for the couple to live in, although her husband, Jeffery Goellner, later reimbursed her for $10,000.00 of the mobile home purchase price. *Id.* Tena also paid for improvements to the property, including $2,400.00 for a well and $3,000.00 for a septic system and tractor use. *Id.* The chancery court found that both parties had contributed to the acquisition and maintenance of the marital property. *Id.* Jeffery had made significant financial contributions, including a lump-sum payment of $57,000 and a $30,000 loan against his retirement account to eliminate the mortgage. *Id.* The chancellor awarded the marital home and real property to Jeffery and directed him to pay Tena half of the equity that was in the house. *Id.* at 1255 (¶10). This Court found no abuse of discretion or manifest error because the chancellor "considered both parties' contributions and crafted an equitable distribution of Tena and Jeffery's marital property." *Id.* at 1266 (¶51).

¶42. Mississippi law provides that separate property can lose its separate character and become marital property if it is commingled with marital assets or used for familial purposes. *McKissack v. McKissack,* 45 So. 3d 716, 720 (¶18) (Miss. Ct. App. 2010) (citing *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶21) (Miss. 2002)); *see also Castle v. Castle*, 266 So. 3d 1042, 1051 (¶35) (Miss. Ct. App. 2018) (finding that separate funds used to build the

20

home lost their separate character because both parties contributed "time and efforts" to the marital home); *Singley v. Singley*, 846 So. 2d 1004, 1011-12 (¶¶19-21) (Miss. 2002) (finding $70,000 in inherited, premarital funds applied toward the down payment of the couple's home had been "co-mingled and transformed into marital property," and reversing the chancellor's decision to require that equitable distribution reflect the origin of the $70,000). In *Goellner*, the court applied this principle by treating Tena's down payments as contributions to the marital estate. *Goellner*, 11 So. 3d at 1265-66 (¶50). The court, however, did not distinguish these funds as separate property since both parties made substantial contributions to the accumulation and maintenance of the property. *Id.* at 1264 (¶46).

¶43. Here, the chancellor determined the Iuka lake house was a marital asset. The chancellor found that it was jointly purchased by and deeded to both parties. Additionally, the chancellor found that Cody and Savannah "made a down payment of $198,204.00 toward the purchase price," and "most of the down payment funds for the Lake House came from Cody." Just as in *Goellner*, the chancellor treated Cody's down payments as contributions to the lake house, and the chancellor found the lake house was a marital asset. The chancellor acknowledged Cody and Savannah's contributions, awarded Cody title and possession of the Iuka lake house, and awarded Savannah equity from the lake house in the amount of $47,500.00. We have reviewed the chancellor's findings of fact and conclusions of law and thoroughly reviewed the record. We hold that the chancellor did not abuse his discretion or commit manifest error in the equitable distribution of the lake house when he considered both parties' contributions and crafted an equitable distribution of Cody and Savannah's marital estate. As stated earlier, separate property can become marital property

21

through commingling and familial use. *See Castle,* 266 So. 3d at 1051 (¶35); *Singley*, 846 So. 2d at 1011-12 (¶¶19-21); *Thompson v. Thompson*, 815 So. 2d 466, 470 (¶15) (Miss. Ct. App. 2002); *Goellner*, 11 So. 3d at 1263 (¶44).

**IV.     Whether the chancellor's retirement-account distribution was a manifest error.**

¶44.    Lastly, Cody argues that the chancellor erred in his distribution of the couple's retirement accounts.  The chancellor awarded Savannah a "$10,000.00 leveling payment from the 401(k) and investment accounts."  Cody contends that the chancellor's distribution of the 401(k) and investment funds was created with information that was not admitted into evidence.  The chancellor's final judgment stated:

> Based on the parties' annual account statements from 2021 through March 31, 2024, and the Court uses this latter date as the line of demarcation for these investment accounts. Cody's and Savannah's 401K account balances are as follows:

**Cody Woods**

| Year | Contribution | Gain/(Loss) | Net |
| --- | --- | --- | --- |
| 2021 (4/2 thru 12/31) | $4,585.58 | $3,601.67 | $8,187.26 |
| 2022 | $3,125.00 | ($11,207.86) | ($8,082.86) |
| 2023 | $8,066.35 | $9,935.71 | $18,002.06 |
| 2024 (1/1 thru 3/31) | $2,044.25 | $5,214.72 | $7,258.97 |
| TOTAL | $17,821.18 | $7,544.24 | $25,365.43 |

**Savannah Woods**

| Year | Contribution | Gain/(Loss) | Net |
| --- | --- | --- | --- |
| 2021 (4/2 thru 12/31) | $4,811.38 | $1,342.16 | $6,153.54 |

| | | | |
|---|---|---|---|
| 2022 | $5,353.87 | ($3,255.96) | $2,097.91 |
| 2023 | $1,269.24 | $3,614.01 | $4,883.25 |
| 2024 (1/1 thru 3/31) | $0.00 | $1,644.94 | $1,644.94 |
| TOTAL | $11,434.49 | $3,365.15 | $14,799.64 |

¶45.  The chancellor relied on Cody's testimony in dividing the couple's retirement accounts. The following exchange took place during Cody's testimony:

**Attorney:** I'm just going to hand you a document that indicates that both you and Savannah have 401(k) accounts; is that correct?

**Cody:** That's correct.

**Attorney:** . . . All right. And this first page shows that your 401(k) statement as of December 31st, 2022, had an ending balance of 31,607.73; is that right?

**Cody:** Yes.

**Attorney:** Okay. And if you flip the page during the same time period, her 401(k) had 17,671.50; is that right?

**Cody:** Yes.

**Attorney:** Okay. So yours does have more than hers; is that fair to say?

**Cody:** Yes.

**Attorney:** All right. I'd ask that this be introduced as an exhibit, please?

**Chancellor**: Any objection?

**Opposing
Counsel**: None, Your Honor.

**Chancellor:** All right. It will be marked as Exhibit 23. Do you want them separately, or do you want them as one document?

**Attorney:** They are stapled together. Just as one document.

23

¶46. The chancellor also relied on exhibit 23, which showed Cody and Savannah's 2022 401(k) statements. Exhibit 23 is a two-page document for the year 2022 indicating the contributions and balances of Cody's and Savannah's 401(k) retirement accounts. Cody testified about exhibit 23 and stated that his balance at the end of 2022 was $31,607.73. Yet the balance in the chancellor's chart for 2022 does not equal $31,607.73. The judgment and chart by the chancellor also included valuations for the years of 2021, 2023, and 2024, which were not reflected in exhibit 23.

¶47. In Cody's Rule 8.05 financial statement filed in 2024, he listed "retirement-payroll deducted" from C Woods Electric as $127.92 per month and $206.74 per month from C W Development. That information does not provide the contributions, gains/losses, or net value for his 401(k) retirement account for any of the missing years of 2021, 2023, or 2024. Also in Cody's 2024 Rule 8.05 financial statement, he lists "American Funds" as an investment with a balance of $31,607.73. That is the same amount that he testified was the balance of his 401(k) retirement account in December 2022 according to exhibit 23.

¶48. In Savannah's Rule 8.05 financial statement filed in 2024, she does not list any deductions under "pension or retirement." Also in Savannah's Rule 8.05 financial statement, she lists "other investments" as $17,671.50.[4] Her statement does not provide the amounts of contributions, gains and losses, or balances for her 401(k) retirement account for the missing years of 2021, 2022, or 2023. Therefore, both Cody and Savannah used their 2022 401(k) balances listed on exhibit 23 for their 401(k) balances in their April 2024 Rule 8.05

---

[4] This is the same amount that Cody testified was the balance of Savannah's 401(k) retirement account in December of 2022 according to exhibit 23.

24

financial statements. The chancellor's chart in the judgment includes contributions, gains and losses, and balances for the years 2021, 2023, and 2024. The values for these years cannot be found in the record on appeal or in either Cody's or Savannah's sworn testimony. Again, one exhibit was introduced at trial concerning the 401(k) retirement accounts, but that was only for the year 2022. The years 2021, 2023, and 2024 are listed in the chancellor's chart but there is no evidence in the record on appeal to determine from wince that information came. That information is simply missing.

¶49.    As a result, this Court cannot assess whether the chancellor's equitable distribution of the couple's retirement accounts was proper, as his findings were not based on evidence contained in the record on appeal.[5] Although Cody testified about their 401(k) accounts from 2022 and the couple's 401(k) annual statements from 2022 were entered into evidence, it cannot be found in the record where Cody or Savannah provided any other evidence for any of the other years listed in the chart.

¶50.    After review, we find insufficient evidence in the record supporting the chancellor's assigned values for Cody's and Savannah's retirement accounts. Therefore, we reverse and remand for the chancellor to determine if the parties should be allowed to supplement the evidence as to this issue, and once that determination is made, then the chancellor shall

_____

[5] While this Court is certain that the chancellor did not arrive at these figures arbitrarily and is equally certain the information used by the chancellor was provided somewhere and somehow by the parties, for some reason that information did not make it into the record on appeal. Be that as it may, the fact remains that the record on appeal does not contain or reflect the source of the information used by the chancellor, which prevents this Court from performing its appellate review of this issue. *See* M.R.A.P. 10(a) ("The parties shall designate the content of the record . . . .").

recalculate the equitable distribution of Cody and Savannah's retirement accounts based on the evidence in the record.[6]

**CONCLUSION**

¶51.    This Court finds no reversible error in the chancellor's finding that the Iuka lake house constituted marital property.  Also, we find no error in the chancellor's finding of equity in the lake house and distributing $47,500.00 of that equity to Savannah.  Accordingly we affirm the judgment in part.  Because the record on appeal has insufficient evidence supporting the chancellor's equitable distribution of Cody's and Savannah's retirement accounts, we reverse the chancery court's judgment in part and remand for the chancellor to address that issue.

¶52.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

---

[6] On remand, the chancellor should be mindful that in 2017, this Court explained that

the chancery court is required to determine the separate estate of each party, as well as the marital estate. Each party is entitled to that party's separate estate plus the appreciation associated with the investment of items in the separate estate, provided neither party has actively contributed to the appreciation during the course of the marriage.

*Billingsley v. Billingsley*, 240 So. 3d 422, 432 (¶26) (Miss. Ct. App. 2017); *Wheat v. Wheat*, 37 So. 3d 632, 638 (¶20) (Miss. 2010). In other words, "[i]n states such as Mississippi where passive income from separate property is separate, the interest earned on premarital contributions should be separate property, while the interest earned on marital contributions is marital property." Deborah H. Bell, *Bell on Mississippi Family Law* § 7.03[2] (3d ed. 2020).